PRINTING MART–MORRISTOWN, A CORPORATION OF THE STATE OF NEW JERSEY, AND LAWRENCE A. QUALIANO, PLAINTIFFS–APPELLANTS, v. SHARP ELECTRONICS CORP., LAURRIET PRINTING, BERT ROSENTHAL, ALLEN ESSEN-FELD, LARRY SINOWAY, AND MANFRED EDELMAN, DE-FENDANTS–RESPONDENTS, AND B–J PRINTING, INC., D/B/A PIPPERT PRESS, AND GEMINI GRAPHICS, DEFEN-DANTS.

Argued October 27, 1987—Decided August 29, 1989.

740

*D. Gayle Loftis* argued the cause for appellants (*Chasan, Leyner, Tarrant & D'Italia,* attorneys; *D. Gayle Loftis* and *Cindy Nan Vogelman,* of counsel and on the briefs).

*Michael S. Meisel* argued the cause for respondents Laurriet Printing and Bert Rosenthal (*Cole, Schotz, Bernstein, Meisel & Forman,* attorneys; *Michael S. Meisel* and *Glenn R. Kazlow,* on the brief).

*Richard E. Brennan* argued the cause for respondents Sharp Electronics Corp., Allen Essenfeld, Larry Sinoway, and Manfred Edelman (*Shanley & Fisher,* attorneys; *Arthur R. Schmauder* and *Kevin Walker,* on the brief).

PER CURIAM.

We granted certification, 108 *N.J.* 200 (1987), to review the Appellate Division's determination that plaintiffs' complaint did not state a cause of action. The complaint seeks recovery of damages for intentional interference with prospective economic relations and for defamation. ("Intentional interference with prospective economic relations" is used in this opinion interchangeably with such expressions as "tortious interference with prospective economic advantage" or "economic benefit," "intentional interference with a prospective contractual relationship," and the like.)

Plaintiff Printing Mart–Morristown (Printing Mart) is in the business of printing and related services. Plaintiff Qualiano is

the corporate plaintiff's president. Defendant Sharp Electronics Corp. (Sharp) was a customer of Printing Mart, and defendants Essenfeld, Sinoway, and Edelman were employees of Sharp. Defendants Laurriet Printing (Laurriet), B–J Printing, Inc., d/b/a Pippert Press (Pippert), and Gemini Graphics (Gemini) were Printing Mart competitors. Defendant Bert Rosenthal was an employee of Laurriet.

The complaint charges that all the defendants tortiously interfered with plaintiffs' prospective contractual relationship with defendant Sharp. It further alleges that defendant Rosenthal and the Sharp-employee defendants defamed plaintiffs with statements the thrust of which was that Printing Mart and Qualiano were "ripping off" Sharp and that Printing Mart's work was shoddy and inadequate. Separate counts of the complaint allege that Sharp and Laurriet are liable for tortious interference and defamation under the doctrine of *respondeat superior.* On defendants' motion the trial court dismissed the complaint and all cross claims under *Rule* 4:6–2(e) for "failure to state a claim upon which relief may be granted." The Appellate Division, in an unreported opinion, affirmed "essentially for the reasons expressed" by the trial court. We reverse.

We conclude that the complaint states a claim against defendant Rosenthal for intentional interference with a prospective contractual relationship. Moreover, the complaint also contains allegations of statements made by the named defendants that are actionable in a cause of action for defamation against all of them. Liability for the claims of defamation and tortious interference against Rosenthal can be imputed to Laurriet. Liability for the claims of defamation against the Sharp-employee defendants can be imputed to Sharp. Given the bare-bones character of the record on this appeal and the principles of law, set forth below, that govern the determination of the sufficiency of facts alleged in a complaint, we are content to let stand so much of the complaint as (1) charges the Sharp-employee defendants with intentional interference with a prospective contractu-

al relationship, and (2) imputes that liability to Sharp under the doctrine of *respondeat superior.*

I

We approach our review of the judgment below mindful of the test for determining the adequacy of a pleading: whether a cause of action is "suggested" by the facts. *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192 (1988). In reviewing a complaint dismissed under *Rule* 4:6–2(e) our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint. *Rieder v. Department of Transp.,* 221 *N.J.Super.* 547, 552 (App.Div.1987). However, a reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." *Di Cristofaro v. Laurel Grove Memorial Park,* 43 *N.J.Super.* 244, 252 (App.Div.1957). At this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint. *Somers Constr. Co. v. Board of Educ.,* 198 *F.Supp.* 732, 734 (D.N.J.1961). For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. *Independent Dairy Workers Union v. Milk Drivers Local 680,* 23 *N.J.* 85, 89 (1956). The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.

II

–A–

With the foregoing precepts in mind, we read the complaint to charge a conspiracy between defendant Rosenthal and the Sharp-employee defendants to drive Sharp's business away from Printing Mart. The claim for intentional interference with prospective economic advantage arises out of the bidding for a

job to print 800 "ECR" manuals for Sharp. The alleged conspiracy was designed to detour from Printing Mart the awarding of the printing contract not on the basis of competitive bids but on the basis of a pre-arrangement involving the submission of bogus bids.

The corporate plaintiff has performed printing services for Sharp since 1976. Sharp officials were apparently pleased with Printing Mart's work, because on May 30, 1984, they issued a directive stating that "whenever printing is done by [a] source other than Printing Mart (for items beyond their capabilities), several estimates should be obtained in order to achieve the best price available." An obvious legitimate implication to be drawn from that statement is that the Sharp directive reveals a policy to give Printing Mart all printing jobs within its capability.

Around September 20, 1985, Sharp-employee defendants Essenfeld, Sinoway, and Edelman allegedly sought to exclude Printing Mart from the bidding on the "ECR"-manual printing job, even though the job was not beyond the corporate plaintiff's capabilities. Defendant Sinoway, who is in charge of administrative purchasing for Sharp, communicated with defendant Rosenthal, a principal corporate officer of plaintiffs' competitor, Laurriet, about the "ECR"-manual printing job. In a conversation on or about September 20, 1985, Rosenthal submitted a bid of $21,095 to print 800 manuals.

But Rosenthal apparently did more in this conversation than simply submit Laurriet's bid: he submitted as well bids on behalf of two other printing companies—Pippert, located in Newark, and Gemini, located on the lower west side of Manhattan. The complaint leaves to conjecture the source of any authorization for Rosenthal to submit bids for Pippert and Gemini. However, the complaint does allege that Rosenthal fixed the Pippert and Gemini bids to make the Laurriet bid look attractive and competitive. All three of the Sharp-employee defendants purportedly knew that the bids were rigged, their

purpose being to exclude Printing Mart from this limited competition.

As it turned out, Printing Mart was permitted to bid on the ECR manual printing job, because Sharp officials superior to Sinoway, Essenfeld, and Edelman demanded that Printing Mart's bid be included in the bidding competition. On October 10, 1985, Printing Mart president Qualiano received specifications for the Sharp job. Oddly, the job specified was to print 900 ECR manuals, not 800. Plaintiffs allege that defendant Essenfeld changed the quantity in the specification to insure that the Laurriet bid would be lower than the Printing Mart bid. On October 10, Printing Mart submitted a bid of $18,225 to print 900 manuals. That figure was $2,870 lower than Laurriet's bid for 800 manuals.

The complaint states that to beat Printing Mart's low estimate, Sharp parcelled the job out: printing pages, collating and packing, binding, and tabbing. Sinoway allegedly called Rosenthal after Sharp had received the Printing Mart bid and instructed Rosenthal to come in with a bid of around $8,600 for printing alone. Rosenthal submitted a second bid on behalf of Laurriet of $8,665 covering page printing only. In its bid for the entire job, Printing Mart had estimated that the printing would cost $9,400.

Printing Mart was not afforded an opportunity to rebid separately on the printing. The complaint charges that defendant Sinoway told plaintiff Qualiano that "Printing Mart was not asked to bid on the printing only because he, Sinoway, did not want him [Qualiano] to bid and he [Sinoway] had no intention of giving Printing Mart the job under any circumstances." Undaunted, Printing Mart wrote to another Sharp official and quoted a price of $8,247.50 for the printing and collating of 900 ECR manuals. However, on October 30, 1985, Sharp issued three purchase orders for components of the printing job. Laurriet was to print the pages of the manuals for $9,768; Pippert was to collate and package the manuals for

$3,890; and a third printer, not a party to this action, was to place the collated pages in binders with tabs for $3,744. By employing three contractors, Sharp kept the entire cost to $17,402. Printing Mart's estimate for the entire job had been $823 more.

There are two tortious-interference counts. The prayer for relief on the first, Count One, states that plaintiffs "seek Judgment of this Count against the defendants Rosenthal, Sinoway, Edelman, Essenfeld, Pippert and Gemini." Absent from the claim on that count are defendants Sharp and Laurriet. The only claim of intentional interference with prospective economic relations against Sharp, which would have been a party to the prospective contract, is found in the fourth count, in which the tortious actions of the Sharp-employees defendants Sinoway, Edelman, and Essenfeld are imputed to Sharp under the doctrine of *respondeat superior.* In the fifth count the tortious conduct of defendant Rosenthal is imputed to his employer, Laurriet, under the same theory. Whether the tortious interference of an employee can be imputed under *respondeat superior* to either party to a prospective contract or a third-party competitor presents a question separate, of course, from whether the complaint states an independent claim against the employees of Sharp and Laurriet for intentional interference with a prospective economic relation.

In dismissing the intentional-interference claims, the trial court concluded that the tactic resorted to by Rosenthal and the Sharp employees was nothing more than "a better sales job." Moreover, the trial court held the view that absent an agreement that would obligate Sharp to continue doing business with Printing Mart (no such agreement is alleged in the complaint), there was no basis for an intentional-interference claim. Finally, the trial court determined that Sharp could not "tortiously interfere with its own contract," but it did not consider the question of whether the Sharp-employee defendants could be individually liable.

–B–

■ An action for tortious interference with a prospective business relation protects the right "to pursue one's business, calling or occupation free from undue influence or molestation." *Louis Kamm, Inc. v. Flink*, 113 *N.J.L.* 582, 586 (E. & A.1934). What is actionable is "[t]he luring away, by devious, improper and unrighteous means, of the customer of another." *Ibid.* Therein lie the elements of a *prima facie* case. The holding of the courts below that plaintiffs' complaint for interference with a prospective contractual relationship was deficient because it did not allege interference with a valid and enforceable contract cannot stand.

■ The separate cause of action for the intentional interference with a prospective contractual or economic relationship has long been recognized as distinct from the tort of interference with the performance of a contract. *Harris v. Perl*, 41 *N.J.* 455 (1964); *C.B. Snyder Realty Co. v. National Newark & Essex Banking Co.*, 14 *N.J.* 146 (1953); *C.B. Snyder Realty Co. v. BMW of N. Am., Inc.*, 233 *N.J.Super.* 65 (App.Div.1989); *Van Horn v. Van Horn*, 52 *N.J.L.* 284 (Sup.Ct.1890). Not only does New Jersey law protect a party's interest in a contract already made, "[t]he law protects also a [person's] interest in reasonable expectations of economic advantage." *Harris v. Perl, supra*, 41 *N.J.* at 462. The reason for protecting prospective interests in contractual or other economic interests was identified long ago as follows:

> In a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it. The cup of Tantalus would be a fitting symbol for such mockery.
> [*Brennan v. United Hatters of N.Am. Local 17*, 73 *N.J.L.* 729, 742–43 (E. & A.1906).]

■ Our courts continue to find actionable interference even when there is no enforceable contract. In *Mayflower Industries v. Thor Corp.*, 15 *N.J.Super.* 337, 339 (Ch.Div.1951), aff'd, 9 *N.J.* 605 (1952), the court found interference with a prospec-

tive home-appliance-distributorship agreement in defendant's groundless threats of litigation. In *Longo v. Reilly*, 35 *N.J.Super.* 405, 412 (App.Div.1955), certif. denied, 25 *N.J.* 45 (1957), the Appellate Division recognized an action for tortious interference with prospective economic relations when defendants altered votes to halt plaintiff's election bid for the office of union secretary. The trial court's statement in this case that there must be an enforceable contract in existence before an action for intentional interference with a prospective economic relationship can lie does not represent the current law.

██ A complaint based on tortious interference must allege facts that show some protectable right—a prospective economic or contractual relationship. Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some "reasonable expectation of economic advantage." *Harris v. Perl, supra,* 41 *N.J.* at 462. A complaint must demonstrate that a plaintiff was in "pursuit" of business. Second, the complaint must allege facts claiming that the interference was done intentionally and with "malice." *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 588; *Kopp, Inc. v. United Technologies, Inc.,* 223 *N.J.Super.* 548, 559 (App.Div.1988); *Levin v. Kuhn Loeb & Co.,* 174 *N.J.Super.* 560, 573 (App.Div.1980) (applies New York law). For purposes of this tort, "[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff." *Restatement (Second) of Torts* Chapter 37 at 5 (introductory note) (1979). Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse. *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N.J.* 552, 563 (1955). Third, the complaint must allege facts leading to the conclusion that the interference caused the loss of the prospective gain. A plaintiff must show that "if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Leslie Blau Co. v. Alfieri,* 157 *N.J.Super.* 173, 185–86 (App.Div.), certif. denied sub nom. *Leslie Blau Co.*

*v. Reitman,* 77 *N.J.* 510 (1978). Fourth, the complaint must allege that the injury caused damage. *Norwood Easthill Assocs. v. Norwood Easthill Watch,* 222 *N.J.Super.* 378, 384 (App.Div.1988).

The *Restatement (Second) of Torts* § 766B (1979) contains the following slightly different definition of a *prima facie* case of intentional interference with a prospective contractual relation:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

The difference is in the use of the term "improper" in place of "malice." The history of that difference is laid out in the Introductory Note to Chapter 37 of the *Restatement (Second) of Torts* (1979); for our purposes it is sufficient to record our conclusion that the *Restatement* test is substantially similar to the "malice" standard currently applied by New Jersey courts.

 More significant is our determination that it is "fundamental" to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship. *Sivell v. Conwed Corp.,* 605 *F.Supp.* 1265, 1268 n. 4 (D.Conn. 1985); *Kopp, Inc. v. United Technologies, Inc., supra,* 223 *N.J.Super.* at 559; *Cappiello v. Ragen Precision Indus., Inc.,* 192 *N.J.Super.* 523, 529–30 (App.Div.1984); *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 141 *N.J.Super.* 437, 450 (App. Div.), certif. denied, 71 *N.J.* 503 (1976); *O'Connor v. Harms,* 111 *N.J.Super.* 22, 27 (App.Div.), certif. denied, 57 *N.J.* 131 (1970). Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference. *Mallory Factor, Inc. v. Schwartz,* 146 *A.D.*2d 465, 468, 536 *N.Y.S.*2d 752, 754 (Sup.Ct. 1989); *Ryan v. Brooklyn Eye & Ear Hosp.,* 46 *A.D.*2d 87, 92,

360 *N.Y.S.*2d 912, 916 (Sup.Ct.1974); *Restatement (Second) of Torts* § 766 comment q (1979). However, the rule of tortious interference was not meant to upset the rules governing the contractual relationship itself. Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law. *Kopp, Inc. v. United Technologies, Inc., supra,* 223 *N.J.Super.* at 559; *Sandler v. Lawn–A–Mat Chem. & Equip. Corp., supra,* 141 *N.J.Super.* at 450; *Restatement (Second) of Torts* § 766 comment v (1979); Note, 81 *Colum.L.Rev.* 1491 (1981). Before a contract is formed, either party may withdraw from negotiations without penalty. *Trustees of The First Presbyterian Church, Newark v. Howard Co.–Jewelers,* 12 *N.J.* 410, 413–14 (1953); *Water Comm'n v. Brown,* 32 *N.J.L.* 504, 510 (E. & A.1866). Contract law serves contractual parties' economic interest, such as enabling them "efficiently [to] breach" the contract, free from the threat of punitive damages. Perman, "Interference with Contractual and Other Economic Expectancies: A Clash of Tort and Contract Doctrine," 49 *U.Chi.L.Rev.* 61, 79 (1982).

The question here is whether the facts as alleged in plaintiffs' complaint state a cause of action for an intentional interference with a prospective economic relationship against defendant Rosenthal of Laurriet Printing and Sharp-employee defendants Sinoway, Essenfeld, and Edelman. We have little difficulty in concluding that plaintiffs' complaint does reveal a sufficient economic interest deserving of protection against interference by the third party to the contractual relationship Rosenthal. (Defendants Pippert and Gemini are not parties to this appeal; we discuss the Sharp-employee defendants below. See *infra* at 760–63.

Without searching far, courts have succeeded in finding a reasonable expectation of economic benefit. In *Di Cristofaro v. Laurel Grove Memorial Park, supra,* 43 *N.J.Super.* 244, the court found that an independent maker of cemetery markers had a reasonable expectation of selling monuments to the public, which had been interfered with by a grave-marker-fee

requirement imposed by a cemetery. Earlier cases also found a reasonable expectation of economic gain in as slight an interest as prospective public sales. See *Van Horn v. Van Horn, supra,* 52 *N.J.L.* 284 (interference with plaintiff's business of selling goods on consignment to public); *Hughes v. McDonough,* 43 *N.J.L.* 459 (Sup.Ct.1881) (interference with blacksmith's interest in selling his services to the public). Those cases show that the right protected is plaintiff's right to "pursue business." *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 586.

There are, in addition, those cases that have found a protectable interest in favor of a real-estate broker who has gained a prospective interest in a commission by introducing a buyer to a seller of property. *Harris v. Perl, supra,* 41 *N.J.* 455; *Louis Schlesinger Co. v. Rice,* 4 *N.J.* 169 (1950); *Leslie Blau Co. v. Alfieri, supra,* 157 *N.J.Super.* 173; *Myers v. Arcadio, Inc.,* 73 *N.J.Super.* 493 (App.Div.1962); *Sustick v. Slatina,* 48 *N.J.Super.* 134 (App.Div.1957); *McCue v. Deppert,* 21 *N.J.Super.* 591 (App.Div.1952). In those cases, however, the real-estate agent is deemed not to have a reasonable expectation of profit from every property shown to every customer. As the court stated in *Weinstein v. Clementsen,* 20 *N.J.Super.* 367, 372 (App.Div. 1952)

> [a] broker does not earn his commission by the mere introduction of a buyer to the owner, but he must be the efficient procuring cause of the contract between seller and purchaser. But where the broker presents a prospective buyer and, on that basis negotiations ensue, even though the broker takes no part in them, and a sale results, then ordinarily the broker is considered to be the efficient cause. [Citation omitted.]

Courts have found no protectable economic benefit in cases where that test has not been met. See *C.B. Snyder Realty, Inc. v. BMW of N. Am., supra,* 233 *N.J.Super.* 65; *McLaughlin v. Weichert Co. Realtors,* 218 *N.J.Super.* 63 (App.Div.1987).

The cases from the real estate world are particularly useful in addressing the interest for which Printing Mart seeks protection. Although Printing Mart does not have an automatic right to satisfy all of Sharp's printing needs, and although

Printing Mart's nine-year business relationship would not in itself form the basis of a prospective economic relationship (that fact looks only to the past instances in which contracts were satisfactorily performed), and although Sharp was always free to find a better printer to do the work needed, the fact remains that on October 10, 1985, Printing Mart president Qualiano received specifications from Sharp to bid on a job to print 900 "ECR" manuals; it was at that point that Printing Mart received the "go ahead" to "pursue business" with Sharp. That invitation is analogous to a prospective property buyer asking a real-estate broker to show the buyer a piece of property. The alleged internal directive issued by Sharp officials on May 30, 1985, is persuasive of the fact that Sharp would have wanted to pursue business with Printing Mart on the "ECR"-manual printing job. The facts recited above, taken together, create a sufficient allegation of a right protectable by an action for tortious interference with a prospective economic relation. Once Printing Mart received an invitation to bid, its pursuit of the printing contract was entitled to protection from unjustifiable interference. *See Louis Kamm, Inc. v. Flink, supra*, 113 *N.J.L.* at 586.

The foregoing conclusion is in keeping with the standard set by the *Restatement (Second) of Torts* (1979). In comment c to section 766B the *Restatement* sets forth this definition of a "prospective economic relation":

> The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.
>
> * * * * * * * *
>
> Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts.

Once Printing Mart received the offer to submit a bid and engaged in the bidding, there was established a relationship

with the potential of leading to a profitable contract. It is that relationship that the law will protect from undue influence.

The next inquiry is whether the complaint alleges that defendants' actions were done with the "malice" required to sustain an action for intentional interference with a prospective economic relation. *See Rainier's Dairies v. Raritan Valley Farms, Inc., supra,* 19 *N.J.* at 563. That element of the cause of action focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 588, "[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse." *Louis Schlesinger Co. v. Rice, supra,* 4 *N.J.* at 181. Because it would be plaintiffs' burden to prove that defendants acted intentionally and wrongfully without justification, *Levin v. Kuhn Loeb & Co., supra,* 174 *N.J.Super.* at 573, we must examine the complaint to determine if it alleges facts that, if proven, fulfill those requirements.

■ Plainly the complaint claims that the conduct of defendant Rosenthal was intentional. It alleges that Rosenthal gave false bids representing the estimates of Pippert and Gemini for the purpose of making his Laurriet bid look attractive and of closing out Printing Mart from the bidding process. Later, Rosenthal was called by Sinoway and was told to return a bid of $8,600 for the printing component of the job alone. Those allegations may fairly be read to allege that Rosenthal acted with the intent to secure for Laurriet the printing job at almost any cost. The clear inference, or at the very least an allowable one, is that Rosenthal intended that Printing Mart lose the job and that his actions were calculated to produce that result.

Determining whether the complaint states facts that equate with wrongful, unjustified conduct is more difficult, only because the test created in the cases is "somewhat amorphous," *Leslie Blau Co. v. Alfieri, supra,* 157 *N.J.Super.* at 204, and because malicious acts are determined on a case-by-case basis.

*Myers v. Arcadio, Inc., supra,* 73 *N.J.Super.* at 500. As stated in *Sustick v. Slatina, supra,* in cases of tortious interference with a prospective economic relationship, the standard must be flexible and must focus on a defendant's actions in the context of the case presented.

> In this area of the law the use of such expressions as conspire, unlawful, malicious, *etc.,* has been criticized as beclouding judgment and clear thinking in the formulation of rules of liability. Yet a degree of generality in the criteria which will suffice to spell out liability in any given case of this kind is unavoidable. The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, *i.e.,* not done in the exercise of an equal or superior right, the ultimate inquiry is whether the conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." In other words, was the interference by defendant "sanctioned by the 'rules of the game.'" There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must [a] defendant[']s[ ] motive and purpose be proper but so also must be the means.
>
> [48 *N.J.Super.* at 144 (citations omitted).]

*Accord Leslie Blau Co. v. Alfieri, supra,* 157 *N.J.Super.* at 186.

The claims against those defendants are such that their conduct, if proven, was not "right" and would not be sanctioned by "the rules of the game." The complaint alleges that defendants made a sham and a mockery out of the bidding process for Sharp's "ECR"-manual printing job. Defendant Rosenthal is said to have submitted false bids on behalf of two companies to make the Laurriet bid appear attractive to Sharp officials. Moreover, the complaint alleges that Sharp-employee defendant Sinoway disclosed Printing Mart's bid to Rosenthal, and that he and Rosenthal made other efforts purposefully to exclude Printing Mart from full participation in the bidding after Printing Mart had been invited to bid on the job. Obviously such conduct can be neither the normal nor the expected course of practice in a contract-bidding job. So far from "the rules of the game" is it that the malice element is unquestionably properly alleged in the complaint.

Courts applying New Jersey law have permitted actions against defendants for similar "sharp dealing." *Harris v. Perl,*

*supra,* 41 *N.J.* at 461; *see Buono Sales, Inc. v. Chrysler Motors Corp.,* 363 *F.*2d 43, 49 (3d Cir.) (holding that under New Jersey law automobile manufacturer could be held liable for interference with prospective economic relations, where in an effort to phaseout dealerships of discontinued DeSoto model, auto maker wrote to DeSoto purchasers and recommended that buyers have their cars serviced at dealerships that did not handle DeSoto), *cert.* denied, 385 *U.S.* 971, 87 *S.Ct.* 510, 17 *L.Ed.*2d 435 (1966), appeal after remand, 449 *F.*2d 715 (1971); *Somers Constr. Co. v. Board of Educ., supra,* 198 *F.Supp.* 732 (count for tortious interference permitted to stand where complaint alleged that architects had maliciously advised board of education to accept a higher bid for construction of new high school); *Robsac Indus., Inc. v. Chartpak,* 204 *N.J.Super.* 149 (App.Div.1985) (plaintiff distributor's low bid rejected on basis of defendant-supplier's informing plaintiff's government-customer of unwillingness to guarantee supplies); *Longo v. Reilly, supra,* 35 *N.J.Super.* 405 (defendants altered votes for plaintiff in union election). Although this area of law is fact-sensitive, it is apparent that the conduct alleged in the complaint before us is of similar quality to that held actionable in the cases cited above.

It is equally apparent that Rosenthal's conduct, if proven, could not be justified merely because he was a competitor motivated by profit. *See, e.g., Harris v. Perl, supra,* 41 *N.J.* at 461 ("[O]thers too may further their equal interest, and if the means are fair, the advantage should remain where success has put it."); *Louis Schlesinger Co. v. Rice, supra,* 4 *N.J.* at 180 (citing *Walker v. Cronin,* 107 *Mass.* 555 (1871)); *Sustick v. Slatina, supra,* 48 *N.J.Super.* at 143 (when a plaintiff's loss of business is a mere "incident of competition," it is *"damnum absque injuria,* unless some superior right by contract or otherwise is interfered with."). However, "[t]he justification must be as broad as the act, and must cover not only the motive and the purpose, or, in other words, the object sought, but also the means used." *Di Cristofaro v. Laurel Grove Memorial*

*Park, supra,* 43 *N.J.Super.* at 255 (citing *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 589). The *Di Cristofaro* court found that competitors' profit motive was no justification, where defendant-cemetery owners assessed excessive fees as a condition to installing gravestones and the effect of the practice was to force the public to buy monuments only from the cemetery owners. *Ibid.* So here, although Rosenthal surely sought to bring profit to Laurriet from the Sharp "ECR"-manual printing job, the fact-finder could conclude that the means he is alleged to have employed were intolerable, as measured by current standards of acceptable business practice.

Moreover, defendant Rosenthal's alleged conduct cannot be excused by any privilege, such as that asserted in *Middlesex Concrete Products and Excavating Corp. v. Carteret Industrial Association,* 37 *N.J.* 507, 518 (1962) (taxpayers' privilege to interfere with municipal settlement negotiations); or *Rainier's Dairies v. Raritan Valley Farms, Inc., supra,* 19 *N.J.* at 564 (privilege favoring free-access to judicial and quasi-judicial bodies); or *Brien v. Lomazow,* 227 *N.J.Super.* 288, 309 (App. Div.1988) (neurologist entitled by statute to file with Attorney–General a report against psychiatrist); or *Holh v. Mettler,* 62 *N.J.Super.* 62, 67 (App.Div.1960) (conditional privilege for citizens to make statements protesting plaintiff's application for trailer-park license).

Finally, the complaint alleges sufficient facts showing causation and damage. A plaintiff shows causation when there is "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Leslie Blau Co. v. Alfieri, supra,* 157 *N.J.Super.* at 185–86; *see Levin v. Kuhn Loeb & Co., supra,* 174 *N.J.Super.* at 572; *Myers v. Arcadio, supra,* 73 *N.J.Super.* at 497–98. Plaintiffs allege that Printing Mart submitted the lowest bid for the entire "ECR"-manual printing job and that its price quotation covering page-printing only was also the lowest bid for that component of the

job. Together with the statements indicating that Printing Mart enjoyed a nine-year working relationship with Sharp, those allegations, if proven, would permit a jury to conclude that Printing Mart would have gained at least the printing component of the Sharp job, in all "reasonable probability," but for defendants' conduct. That is sufficient to meet the "causation" component of a cause of action for tortious interference.

The failure to satisfy the requirement for allegation of facts demonstrating that a plaintiff has suffered or will suffer damage can be fatal to a claim. In *Norwood Easthill Associates v. Norwood Easthill Watch, supra,* plaintiff-developers could not show that actual damages resulted to their settlement negotiations with borough officials, where defendant citizens group and its members threatened to cause an IRS investigation to begin against the attorney and mayor of the municipality. 222 *N.J.Super.* at 382. Norwood Easthill Associates' claim failed to state a cause of action. In contrast, Printing Mart's and Qualiano's complaint does allege actual damages because it asserts that plaintiffs lost any gain from the "ECR"-manual job.

That plaintiffs have stated a cause of action against Rosenthal is clear. We hasten to add that our holding simply allows the claim to survive the motion for dismissal for failing to state a claim on which relief can be granted. Plaintiffs must still prove each element of the case. Nevertheless, as one court has observed, "the fact that the plaintiff has chosen a long and arduous road to recovery does not justify our blocking that road at this point." *Somers Constr. Co. v. Board of Educ., supra,* 198 *F.Supp.* at 740.

■ Determining whether the complaint states a cause of action for tortious interference against defendants Sinoway, Essenfeld, and Edelman presents a special problem, because those defendants are agents for a party to the alleged prospective contractual relationship, defendant Sharp. As discussed above, a party to an existing or prospective contractual relation-

ship cannot be held directly liable for tortious interference with that relationship, because the actions of the parties to a contract are judged under contract law. The fact that an independent cause of action for tortious interference cannot exist against Sharp does not, however, answer the question of whether the employees of Sharp can be held liable for tortious interference with a prospective contractual relationship to which Sharp was a party.

Theoretically, the Sharp employees can be answerable for interfering with their employer's prospective contractual relationship. A corporation is regarded in law as an entity distinct from its individual officers, directors, and agents. *Specht v. Eastwood–Nealley Corp.*, 25 *N.J.Super.* 69, 73 (App. Div.1953). Thus, the Sharp-employee defendants are not parties to any contract that Sharp enters. However, a corporation is an artificial entity that lacks the ability to function except through the actions of its officers, directors, agents, and servants. *Templeton v. Scudder*, 16 *N.J.Super.* 576, 582 (App. Div.1951). The issue this case presents is whether an employee acting on behalf of Sharp can be held individually liable for tortious interference even though Sharp cannot be held directly liable.

Ordinarily, resolution of that question would require us to decide which of two principles of agency law, discussed below, controls in the tortious-interference context. Because the parties have not briefed or argued those conflicting principles and because there is no indication that the trial court or Appellate Division reflected on those principles, we are reluctant to decide the point, particularly in the absence of a more informative record than the naked complaint, which is unilluminated by the kinds of proofs that might inspire confidence in a policy decision of some magnitude. A brief exposition of the contending principles is in order, however, to the end that the parties and the trial court may channel their arguments and decisions on the remand accordingly.

One general principle of agency law states that when an employee performs an act that is otherwise a tort, the employee is not relieved of liability simply because he or she acted on behalf of the employer. *Moss v. Jones,* 93 *N.J.Super.* 179, 184 (App.Div.1966); *Mayfair Fabrics v. Henley,* 101 *N.J.Super.* 363, 369 (Law Div.1968); *Whalen v. Pennsylvania R.R. Co.,* 73 *N.J.L.* 192, 194 (Sup.Ct.1906); *Brokaw v. New Jersey R.R. and Transp. Co.,* 32 *N.J.L.* 328, 333–34 (Sup.Ct.1867); *Restatement (Second) of Agency* § 343 at 105 (1958). The employee remains liable individually, even though the tortious act conferred no personal benefit on or produced no advantage for the employee and the wrongful act was undertaken only to benefit the employer. *Hirsch v. Phily,* 4 *N.J.* 408, 416 (1950); *Van Dam Egg Co. v. Allendale Farms, Inc.,* 199 *N.J.Super.* 452, 457 (App.Div.1985); *McGlynn v. Schultz,* 90 *N.J.Super.* 505, 522 (Ch.Div.1966), aff'd, 95 *N.J.Super.* 412, certif. denied, 50 *N.J.* 409 (1967). Some cases applying New Jersey law indicate that the foregoing principle can operate to hold an employee liable for intentional interference with a prospective contractual relationship even though the employer would be a party to the relationship and the employee was acting on behalf of the employer. *Kyriazi v. Western Elec. Co.,* 461 *F.Supp.* 894, 950 (D.N.J.1978); *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* 582; *Cappiello v. Ragen Precision Indus., Inc., supra,* 192 *N.J.Super.* at 530.

However, it is also a principle of agency law that an employee cannot be held liable for actions that otherwise would constitute a tort when the employee

is exercising a privilege of the principal, or a privilege held by [the employee] for the protection of the principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed.

[*Restatement (Second) of Agency* § 343 at 105 (1958).]

This principle too has been recognized by New Jersey courts. *E.g., Mayfair Fabrics v. Henley, supra,* 101 *N.J.Super.* at 370. Cases in other jurisdictions have relied on this agency-law principle to hold privileged the conduct of an employee of a party to an economic relationship when that conduct would

otherwise constitute a tortious interference. *E.g., George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 *F.*2d 1326, 1333 (7th Cir.), reh'g denied, 776 *F.*2d 198 (1984); *Kruse v. Bank of Am.,* 202 *Cal.App.*3d 38, 66, 248 *Cal.Rptr.* 217, 234 (1988), *cert.* denied, —— *U.S.* ——, 109 *S.Ct.* 870, 102 *L.Ed.*2d 993 (1989); *Bolz v. Myers,* 200 *Mont.* 286, 292, 651 *P.*2d 606, 610 (1982); *Murtha v. Yonkers Child Care Ass'n,* 45 *N.Y.*2d 913, 915, 383 *N.E.*2d 865, 866, 411 *N.Y.S.*2d 219, 220 (1978); *Kartiganer Assocs., P.C. v. Town of New Windsor,* 108 *A.D.*2d 898, 899, 485 *N.Y.S.*2d 782, 783 (1985); *Welch v. Bancorp Management Advisors, Inc.,* 296 *Or.* 208, 675 *P.*2d 172, 178, reh'g denied, 296 *Or.* 713, 679 *P.*2d 866 (1983).

Having outlined the apparent conflict, we go no further. As we have observed, the record is devoid of any cogent discussion of the issue, and the trial court's terse explication for dismissing plaintiffs' complaint, adopted by the Appellate Division, gives no indication that the stated principles were a matter of any concern. No party presents an argument that would permit us to reach an informed decision. Ultimate resolution of the question of whether an employee of a party to a prospective economic relationship can be held liable for tortious interference may require the Court to create a special cause of action against the employee. *See Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58 (1980). That important decision can await the submission of a record that will be fully developed, either on the remand in this case or in some other case. *See Cramer v. Betchner,* 47 *N.J.* 345, 347 (1966); *Mara v. Township of Parsippany–Troy Hills,* 20 *N.J.* 274, 275 (1956). For now the complaint for tortious interference will stand against the Sharp-employee defendants, as it will, as explained in Part IV, *infra* at 770–71 against Sharp.

III

We turn now to the issue of whether plaintiffs' complaint states a cause of action for defamation. The second count reads in part:

2. That on or about August 20, 1985[,] and continuing down to date, the defendants Rosenthal, Laurriet, Gemini, Pippert, Sinoway, Essenfeld, and Edelman * * * caused defamatory statements and publications to be made against the reputation of the plaintiffs Printing Mart and Qualiano to wit: the plaintiffs were "ripping off" Sharp, that defendant Laurriet could beat all of plaintiff's prior quotes by at least $1000 per quote, that plaintiff Printing Mart was never the lowest bidder on any job, that plaintiffs "were not qualified" to do the work for defendant Sharp, that plaintiffs were a "mere convenience" and plaintiffs' prices were unreasonable and their work inadequate.

3. In aid of the conspiracy to defame plaintiffs Printing Mart['s] and Qualiano['s] reputation[s], defendant Sinoway with the knowledge, support and approval of defendants Edelman and Essenfeld, submitted plaintiff Printing Mart's pricing on past contracts to defendant Rosenthal for the purpose of having Rosenthal prepare a presentation that would demonstrate that defendant Laurriet could save defendant Sharp $1000 to $1200 on comparable jobs. The presentation was completed by defendant Rosenthal and presented to the officers and employees of defendant Sharp including the Accounting Department by the defendants Sinoway, Edelman, and Essenfeld. The sole purpose of the presentation was to discredit the plaintiffs Printing Mart and Qualiano in order to justify the issuance of a directive by defendants Sinoway and Edelman that plaintiffs Printing Mart and Qualiano would not be able to deal with or bid printing jobs for defendant Sharp.

4. That by reason of the conspiracy and the false, malicious and untrue statements and [the] publications of defendants aforesaid, that plaintiff Printing Mart suffered damage to its reputation, its business, its credit, its standing in the business community and in its business association with defendant Sharp.

Plaintiffs' counsel acknowledged, at argument of the motion to dismiss, that plaintiffs knew no more than was alleged, but he argued that additional facts could be proven as they were discovered. He said, "that's why we have [i]nterrogatories you know, you can't dismiss a complaint before discovery because they haven't gotten discovery."

The trial court, unpersuaded by this argument, dismissed the defamation count for two reasons. The court found first that the complaint was fatally lacking in detail: "Some vague references to some statements made during some kind of sales pitch is not a defamation situation." In addition, the court held that the alleged statements could not be deemed defamatory, even had all the details of the complaint been properly set forth. Counsel for Laurriet and Rosenthal argued that the alleged statements were in fact aimed to injure the reputation of

Printing Mart; however, the words were "no more than sales puffing." The court agreed:

> The statements that were made are not out of the ordinary for normal business-type situations. That doesn't necessarily make them right at all. What they were in this case were statements that "I can do it better, and I can do it cheaper." That's what the statements were. Those are the normal situations that are used in any sales pitch, anywhere along the line, and no matter how you want to say it, the competition comes in and says, "I can do it better, and I can do it cheaper."

We return to first principles. Defamation imposes liability for publication of false statements that injure the reputation of another. *Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 190, *cert.* denied, 459 *U.S.* 907, 103 *S.Ct.* 211, 71 *L.Ed.*2d 169 (1982). As this Court has recently stated, the threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning. *Decker v. Princeton Packet, Inc.*, 116 *N.J.* 418 (1989); *see Romaine v. Kallinger*, 109 *N.J.* 282, 290 (1988) (citing *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67 (1982)); *Mosler v. Whelan*, 28 *N.J.* 397, 404–05 (1958). Thus, in this case we review the complaint to determine whether the six statements alleged could be held as a matter of law to be not defamatory.

Words that clearly denigrate a person's reputation are defamatory on their face and actionable *per se*. *Lawrence v. Bauer Publishing & Printing Ltd.*, 89 *N.J.* 451, 459 *cert.* denied, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982); *Shaw v. Bender*, 90 *N.J.L.* 147, 149 (E. & A.1916). To determine whether that test is met, a court must scrutinize the language "according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Romaine v. Kallinger, supra,* 109 *N.J.* at 290 (citing *Herrmann v. Newark Morning Ledger Co.*, 48 *N.J.Super.* 420, 431 (App.Div.), aff'd on reh'g, 49 *N.J.Super.* 551 (App.Div.1958)). On the other hand, words that are not susceptible of any defamatory interpretation are not actionable, and a cause of action will not lie for such statements. *Lawrence v. Bauer*

*Publishing & Printing Ltd., supra,* 89 *N.J.* at 459; *Cibenko v. Worth Publishers, Inc.,* 510 *F.Supp.* 761, 764–65 (D.N.J.1981). When words are capable of multiple meanings, the question of whether the words defame is one for the jury. *Mosler v. Whelan, supra,* 28 *N.J.* at 404–05. Any special derogatory meaning attributed to the words, not common to normal usage, must be specifically pleaded. *Dorney v. Dairymen's League Coop. Ass'n,* 149 *F.Supp.* 615, 619 (D.N.J.1957).

Three of the six statements alleged in the complaint we find to be open to a defamatory meaning and actionable on their face. Statements that plaintiffs were "ripping off" a client, that plaintiffs "were not qualified to do the work for defendant Sharp" (if stated as fact rather than merely as opinion, an issue to be determined at trial), and that plaintiffs did unreasonably-priced, inadequate work all tend to denigrate and degrade the reputation of Printing Mart and its president, Qualiano. Plaintiffs argue that the foregoing words imply that the Printing Mart Organization is engaged in a course of illegal or at least improper or unethical conduct, a contention that goes beyond what the law of defamation requires. Plaintiffs need not show that the words impute to them illegality or immorality. It is sufficient that the false declaration adversely affect a plaintiff's reputation, business, trade, profession, or office. *Sokolay v. Edlin,* 65 *N.J.Super.* 112, 121–22 (App.Div.1961); *Herrmann v. Newark Morning Ledger Co., supra,* 48 *N.J.Super.* at 430. New Jersey courts have long held actionable false statements designed to produce an adverse effect on one's business or trade. *See Mick v. American Dental Ass'n,* 49 *N.J.Super.* 262, 274 (App.Div.), certif. denied, 27 *N.J.* 74 (1958); *Morris Feder & Co. v. Herrick,* 43 *N.J.L.* 24, 27 (Sup.Ct.1881).

The import of the allegations that plaintiffs "were not qualified to do the work for defendant Sharp" and that plaintiffs did unreasonably-priced, inadequate work is clear. At least it is clear that those statements could not be held as a matter of law

to be *not* defamatory. Moreover, a modern usage dictionary defines the noun "rip off" as

> 1: an act or instance of stealing: THEFT; also: a financial exploitation 2: an usu. cheap exploitive imitation
> [Webster's New Collegiate Dictionary, 1017 (9th ed. 1988).]

The import is again unmistakable. We note also that it is not necessary for the complaint to contain a "verbatim transcription of the words spoken." *Kotok Bldg. v. Charvine Co.*, 183 *N.J.Super.* 101, 105 (Law Div.1981); *Hand v. Hand*, 23 *N.J. Misc.* 118, 119–20 (Cir.Ct.1945).

The three remaining statements, however—those concerning beating Printing Mart's prices, characterizing Printing Mart as a "mere convenience" to Sharp, and stating that Printing Mart had never been the lowest bidder—are incapable of conveying a defamatory meaning. In the absence of the pleading of additional facts to demonstrate the defamatory nature of those statements, a cause of action cannot be based on those words. *Dorney v. Dairymen's League Coop. Ass'n, supra,* 149 *F.Supp.* at 619. The statement that Laurriet could beat Printing Mart's prices by $1000 to $1200 per quote contains nothing to belittle the reputation of Printing Mart; it is no more than the mere boasting of a competitor. The statement that plaintiffs were a "mere convenience" to Sharp tends more to impute laziness and sloth to Sharp officials than it does to tarnish plaintiffs' business reputation. Also, the statement that Printing Mart has never been the lowest bidder on any job is not, standing alone and without the pleading of supportive facts, capable of a defamatory meaning, under any interpretation given by reasonable persons of ordinary intelligence. *Dressler v. Mayer*, 22 *N.J.Super.* 129, 136 (App.Div.1952); *Novack v. Cities Serv. Oil Co.*, 149 *N.J.Super.* 542, 550 (Law Div.1977), aff'd, 159 *N.J.Super.* 400 (App.Div.), certif. denied, 78 *N.J.* 396 (1978).

In addition to alleging defamatory statements, the complaint must plead facts sufficient to identify the defamer and the circumstances of publication. *Zoneraich v. Overlook*

*Hosp.*, 212 *N.J.Super.* 83, 101 (App.Div.), certif. denied, 107 *N.J.* 32 (1986). Also, the circumstances must show that the statements are "of and concerning" plaintiff. *Durski v. Chaneles,* 175 *N.J.Super.* 418, 420 (App.Div.1980). It must appear that a third person understood the statements to relate to the plaintiffs. *Gnapinski v. Goldyn,* 23 *N.J.* 243, 253 (1957).

It is not enough for plaintiffs to assert, as they did at argument of the motion, that any essential facts that the court may find lacking can be dredged up in discovery. A plaintiff can "bolster a defamation cause of action through discovery, but not [ ] file a conclusory complaint to find out if one exists." *Zoneraich v. Overlook Hosp., supra,* 212 *N.J.Super.* at 101–02. As pointed out in the cogent discussion of "fact pleading" versus "notice pleading" in *Kotok Building v. Charvine Co., supra,* 183 *N.J.Super.* at 103–05, a plaintiff must plead the facts and give some detail of the cause of action.

Sharp and the Sharp-employee defendants, Sinoway, Edelman, and Essenfeld, argue that the complaint should fail because it lacks necessary details of time, place, and manner of the alleged defamation. They cite *Zoneraich v. Overlook Hospital, supra,* 212 *N.J.Super.* 83, and *Kotok Building v. Charvine Co., supra,* 183 *N.J.Super.* 101, to support their position. In *Kotok* the court was correct to find defective a claim for defamation that stated only that

> [p]laintiff has falsely and maliciously, and for the purpose of injuring the defendant/counterclaimant in his good name, fame and credit both as an individual and as a businessman, spoke [sic] of and concerning the said counterclaimant, in slanderous and vile names, and has defamed the reputation and name of said counterclaimant.
>
> [*Id.* at 102–03.]

The complaint in *Zoneraich,* equally conclusory, was correctly dismissed inasmuch as it stated merely that "[defendants] have slandered and defamed [plaintiff] and wilfully, unlawfully and maliciously exposed her to public ridicule." 212 *N.J.Super.* at 101. *See, e.g., Brown v. Fairleigh Dickinson Univ.,* 560 *F.Supp.* 391 (D.N.J.1983); *National Bowl–O–Mat Corp. v. Brunswick*

*Corp.,* 264 *F.Supp.* 221 (D.N.J.1967); *Patrick v. Esso Standard Oil Co.,* 156 *F.Supp.* 336 (D.N.J.1957); *Lands v. Baseman,* 200 *N.J.Super.* 247 (App.Div.) certif. denied, 101 *N.J.* 281 (1985).

In contrast to the cases above, plaintiffs' claim is stated with sufficient particularity to carry a cause of action on the three statements determined above to be defamatory. Granted, the paragraphs in the second count are not crystal clear. The complaint is disjointed. In paragraph two we are given the defaming words but no indication of who stated them, where they were stated, and to whom they were communicated. That paragraph alleges only that the defendants "caused the defamatory statements to be made." However, the third paragraph states that defendant Rosenthal submitted a report, prepared with the help of defendants Edelman and Essenfeld, which was presented to Sharp officials and employees by defendants Sinoway and Edelman. Assuming that the defamatory statements are either contained in the report or were uttered by either Sinoway or Essenfeld, those details sufficiently describe the circumstances of publication to survive a *Rule* 4:6–2(e) motion to dismiss for failing to state a claim. The statements were directed to Sharp officials in the context of a business presentation, and it can reasonably be inferred that the statements referred to plaintiffs, because the gist of the meeting was to obtain a new directive from Sharp officials to exclude plaintiffs from performing any further printing jobs for Sharp. Those statements allege the circumstances of the defamation with a particularity greater than may be found in the circumstances of any of the cases cited above.

Having come this far we must acknowledge that there remains the question of whether plaintiffs must allege damage and fault in the complaint. Neither plaintiffs nor defendants argue either issue, but both are important in determining whether plaintiffs have stated a cause of action or whether their action should fail at this preliminary stage.

Resolution of the stated issue may depend on our interpretation of the United States Supreme Court holdings in *Gertz v. Robert Welsh, Inc.*, 418 *U.S.* 323, 349, 94 *S.Ct.* 2997, 3011, 41 *L.Ed.*2d 789, 810 (1974); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 105 *S.Ct.* 2939, 86 *L.Ed.*2d 593 (1985); and *Philadelphia Newspapers, Inc. v. Hepps*, 475 *U.S.* 767, 106 *S.Ct.* 1558, 89 *L.Ed.*2d 783 (1986), among others. Holding that in cases involving private persons and matters not of public concern there need not be an allegation of either damage or fault are *Nelson v. Lapeyrouse Grain Corp.*, 534 *So.*2d 1085, 1095–96 (Ala.1988); *Vinson v. Lim Mar Community School District*, 360 *N.W.*2d 108 (Iowa 1984); and *Brannan v. Wyeth Laboratories, Inc.*, 526 *So.*2d 1101, 1105 (La.1988). Holding that there is such a requirement are *Rimmer v. Colt Industries Operating Corp.*, 495 *F.Supp.* 1217 (W.D.Mo.1980), rev'd on other grounds, 656 *F.*2d 323 (8th Cir.1981); *New England Tractor–Trailer Training, Inc. v. Globe Newspaper Co.*, 395 *Mass.* 471, 480 *N.E.*2d 1005 (1985); *Rouch v. Enquirer & News of Battle Creek*, 137 *Mich.App.* 39, 357 *N.W.*2d 794 (1984), aff'd, 427 *Mich.* 157, 398 *N.W.*2d 245 (1987); *Ledl v. Quik Pik Food Stores Inc.*, 133 *Mich.App.* 583, 349 *N.W.*2d 529 (1984); *Anson v. Erlanger Minerals and Metals, Inc.*, 702 *P.*2d 393 (Okla.Ct.App.1985); *Dunlap v. Wayne*, 105 *Wash.*2d 529, 716 *P.*2d 842 (1986). This issue of "damage and fault" too is one the resolution of which by this Court should await the development of a record or, at the very least, the research efforts and arguments of counsel, with reasoned consideration by the courts below, wherefore we will not permit the complaint to be stricken at this juncture.

## IV

Finally, we address the sufficiency of so much of the complaint as asserts the liability of Sharp and Laurriet on the theory of *respondeat superior* for the allegedly tortious acts of those corporate defendants' employees. In keeping with our conclusion that the record is insufficient for us to address the

issue of whether as a matter of law the Sharp-employee defendants can be exposed to liability for tortious interference, we defer a definitive answer on Sharp's vicarious liability. The question is too important to be answered in what is almost the abstract. We will not dismiss counts of a complaint that come to us in the posture presented on this record.

We are satisfied, however, that there is no obstacle to our holding that the complaint does state a cause of action against Laurriet, based on *respondeat superior* principles, for employee Rosenthal's intentional interference with plaintiffs' prospective contractual relations. An employer is liable to a third party for torts committed by an employee when the employee acts within the scope of his or her employment. *Di Cosala v. Kay*, 91 *N.J.* 159, 169 (1982); *Klitch v. Betts*, 89 *N.J.L.* 348, 351 (E. & A.1916). An employee is acting within the scope of employment if the action is "of the kind that [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master." *Di Cosala v. Kay, supra,* 91 *N.J.* at 169 (citing *Restatement (Second) of Agency* § 228 (1958)). Rosenthal's efforts, as alleged, to win the "ECR"-manual contract for Laurriet clearly appears to be within the scope of his employment sufficiently to survive a motion to dismiss at this preliminary stage. *See Robsac Indus., Inc. v. Chartpak, supra,* 204 *N.J.Super.* 149. Also, both Sharp and Laurriet could be held liable under *respondeat superior* principles if their employees defamed plaintiffs. At this juncture the counts claiming liability against Sharp and Laurriet survive the *Rule* 4:6–2(e) motion to dismiss.

## V

The importance of today's decision lies not so much in its explication of the principles of tortious interference and defamation as in its signal to trial courts to approach with great caution applications for dismissal under *Rule* 4:6–2(e) for fail-

ure of a complaint to state a claim on which relief may be granted. We have sought to make clear that such motions, almost always brought at the very earliest stage of the litigation, should be granted in only the rarest of instances. If a complaint must be dismissed after it has been accorded the kind of meticulous and indulgent examination counselled in this opinion, then, barring any other impediment such as a statute of limitations, the dismissal should be without prejudice to a plaintiff's filing of an amended complaint.

Judgment reversed, cause remanded.

*For reversal and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.