NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0921-24
A-1568-24

MEGAN MCDERMOTT,

    Plaintiff-Appellant/Cross-
Respondent,

v.

GUARANTEED RATE, INC.,
JOSEPH MOSCHELLA, and
JON LAMPKIN,

    Defendants-Respondents/
Cross-Appellants.

_____

GERALDINE RIVERA-
SANTANA,

    Plaintiff-Appellant,

v.

CJF SHIPPING, LLC, JULIE
BATISTA and MARIA SANCHEZ,

    Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

December 26, 2025

APPELLATE DIVISION

        Argued October 27, 2025 – Decided December 26, 2025

        Before Judges Sabatino, Natali and Walcott-
Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0360-24 (A-0921-24) and Essex County, Docket No. L-5834-24 (A-1568-24).

Joshua S. Boyette argued for appellant/cross-respondent Megan McDermott in A-0921-24 (Swartz Swidler, LLC, attorneys; Joshua S. Boyette, on the briefs).

Peter D. Valenzano argued the cause for appellant Geraldine Rivera-Santana in A-1568-24 (McOmber, McOmber & Luber, PC, attorneys; Peter D. Valenzano, of counsel and on the brief; Anna F. Esposito, on the briefs).

Carmen J. DiMaria argued the cause for respondents/cross-appellants Guaranteed Rate, Inc., Joseph Moschella and Jon Lampkin in A-0921-24 (Ogletree Deakins, attorneys; Carmen J. DiMaria, of counsel; Robert M. Pettigrew, on the briefs).

Sarah M. Zucco argued the cause for respondents CJF Shipping, LLC, Julie Batista and Maria Sanchez in A-1568-24 (Ogletree Deakins, attorneys; Sarah M. Zucco, on the brief).

Jonathan I. Nirenberg argued the cause for amicus curiae National Employment Lawyers Association in A-1568-24 (Rabner Baumgart Ben-Asher & Nirenberg, PC, attorneys; Jonathan I. Nirenberg, on the brief).

The opinion of the court was delivered by

NATALI, J.A.D.

These appeals, which we have consolidated for the purposes of issuing a single opinion, involve similar issues, one of which – the scope of the Ending Forced Arbitration of Sexual Assault and Harassment Act of 2021 (EFAA), 9 U.S.C. §§ 401-402, is a matter of first impression in New Jersey. In A-0921-24, Megan McDermott challenges the court's order that applied the EFAA to bar from arbitration only those counts in her fourteen-count complaint related to the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. The court permitted her LAD claims to proceed in the Law Division but severed the rest for prosecution in an arbitral forum and rejected her later application for reconsideration. The court also denied defendants' motion to dismiss plaintiff's LAD sexual harassment claim as time barred, a decision they challenge by way of a cross-appeal.

Geraldine Rivera-Santana's appeal in A-1568-24 raises nearly identical issues. For her part, she challenges the court's order that limited the application of the EFAA's arbitration bar to only her LAD hostile work environment sexual harassment-based claim, but directed her remaining claims, all of which were plead under the LAD, to arbitration after finding they arose out of a different set of operative facts. The Rivera-Santana court also rejected defendants' application to dismiss her LAD-based cause of action for

sexual harassment, gender discrimination, and hostile work environment as untimely.

We reject defendants' arguments that the EFAA should be interpreted to bar only those claims for which the underlying conduct related specifically to a sexual harassment cause of action, and instead, adopt the majority view of published federal and state court opinions that have considered this issue, and conclude Section 402(a) of the EFAA renders pre-dispute arbitration agreements unenforceable as to all claims in a multiclaim dispute where plaintiff has pled a viable claim involving sexual harassment. We agree, however, with both courts' decision that, through the indulgent lens of a Rule 4:6-2(e) application, as pled plaintiffs' LAD-based sexual harassment claims are not time-barred.

I.

A.

In her complaint, McDermott[1] alleges, while working as an employee of defendant Guaranteed Rate, Inc. (GRI), she was subjected to pervasive acts of sexual harassment and gender discrimination, principally through her interactions with her supervisors, defendants Joseph Moschella and Jon

---

[1] We refer to plaintiffs Megan McDermott and Geraldine Rivera-Santana by their surnames throughout the opinion for clarity, intending no disrespect.

A-0921-24

Lamkin.[2]  She maintains the harassment and discrimination she suffered throughout her employment caused her to resign from her position at GRI in November 2022.  She also maintains those facts also serve as the bases for all her additional claims against defendants for failure to pay wages due at termination, breach of contract, commercial misappropriation of her likeness, unfair competition, and tortious interference with prospective contractual relationships.

McDermott began as a licensed mortgage loan officer when she was hired by Moschella to work at Superior Mortgage in 2005.  Her responsibilities included collecting loan fees, managing loan applications, and overseeing the terms and conditions of potential loans.  McDermott contends that in 2006, Moschella, who served as her manager at the time, told her "he had almost not hired her because she 'was a lawsuit waiting to happen.'"

When GRI acquired Superior Mortgage in 2012, both she and Moschella became GRI employees.  At GRI, Moschella served as a regional manager, responsible for the entire region in which McDermott worked.

After Superior Mortgage's acquisition, Lamkin became McDermott's direct manager, operating at a level between her and Moschella.  After meeting

---

[2]  McDermott's complaint appears to misspell Lamkin's surname, as the rest of the record spells it as Lamkin, the spelling we employ in our opinion.

A-0921-24

Lamkin at a corporate event, McDermott alleges Lamkin made an explicit sexual comment about her family and children, which she found "disgusting, repulsive, and demeaning." McDermott contends that she reported this comment to Moschella who "pressured" her "to not make a formal complaint of sexual harassment." McDermott alleges that Lamkin continued to be "regularly abusive" and "regularly scream[] at her and us[e] gender-based and demeaning slurs to refer to [her]."

She asserts she later complained about Lamkin's behavior to representatives in the Human Resources Department at GRI in 2019, but they failed to investigate her claims. She also contends that another female loan officer, on multiple instances, complained to Human Resources about Lamkin and that "[t]wo other female employees . . . resigned in whole or in part due to Lamkin's abusive behavior."

McDermott contends she excelled at her job, and she was recognized for multiple years, as a member of GRI's President's Club and Chairman's Circle, designations reserved for "high-performing loan officers." She also alleges that based on this success, she asked Moschella and Lamkin for a retention bonus, and they informed her that GRI did not provide such bonuses, a representation she maintains was false as she later discovered GRI had given retention bonuses to male loan officers. She also alleges GRI did not increase

A-0921-24

her commission formula when she reached the Chairman's Circle, a practice that was common for male employees.

McDermott resigned from GRI in November 2022 and maintains she did so because of "Lamkin's persistent and pervasive abuse continued through the end of [her] tenure with [GRI]." She asserts Lamkin "regularly spoke to [her] in an aggressive and disrespectful manner," and she "witnessed and received reports" that Lamkin also "regularly spoke to other female employees of [GRI] in an aggressive, disrespectful, and demeaning manner." She stated she resigned "because of the gender discrimination and sexually hostile work environment."

When GRI first became McDermott's employer, she signed a Sales Compensation Plan that included an arbitration agreement and forum selection clause which provided "[a]ny and all claims (legal or equitable) or controversies between [e]mployee . . . and the [c]ompany must be resolved by arbitration" and that "[s]uch arbitration shall take place in Chicago, Illinois." The Sales Compensation Plan included a fee-shifting provision that the employee "agrees that in any action to enforce, defend and/or prosecute any of the terms herein, GRI shall be entitled to recover from [e]mployee its

7

attorneys' fees and costs related to such action."[3]   The agreement also

contained a severance provision that provided:

> [i]f any provisions of this [a]greement or the application of any provision of this [a]greement to any party or circumstance shall be prohibited by, or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision, any other provision of this [a]greement, or the applicable of such provision to other parties or circumstances.

In her operative complaint, McDermott alleged three violations of the

LAD against all defendants, including gender-based pay discrimination (count

one); sexual and gender-based harassment and hostile work environment

(count two); and constructive discharge (count three).   As to GRI specifically,

she alleged disparate pay in violation of the New Jersey Equal Pay Act

(NJEPA), N.J.S.A. 34:11-56.1 to -56.14, (count four); two violations of the

New Jersey Wage Payment and Collection Law (NJWPCL), N.J.S.A. 34:11-

4.1 to -33.6 including failure to pay wages due at termination (count five) and

failure to pay commissions due (count six); two counts of breach of contract

(counts seven and eight); two counts of the breach of the covenant of good

faith and fair dealing (counts nine and ten); commercial misappropriation of

likeness (count eleven); unfair competition (count twelve); tortious

---

[3] We have not been asked to address the enforceability of this fee-shifting clause.

interference with prospective contractual relationships (count thirteen); and misappropriation in violation of the New Jersey Unfair Competition Law, N.J.S.A. § 56:4-1 (count fourteen).

Defendants moved to dismiss the complaint under Rule 4:6-2(a) and (e), arguing her sexual harassment claim in count two was time-barred and sought to compel arbitration on the remaining counts. After considering the parties' written submissions and oral arguments, the court entered an order denying defendants' motion to dismiss count two, granting the request to compel arbitration on counts four through fourteen, and retained jurisdiction over counts one through three.

The court explained it declined to dismiss McDermott's sexual harassment claim in count two under Rule 4:6-2(e), because "[her] [c]omplaint support[ed] a viable claim that [McDermott] was subjected to a hostile work environment on the basis of her sex/gender" and that "the alleged conduct directed at [her] and other women included demeaning, abusive, coarse language, and unequal treatment based on sex/gender." The court determined that "[s]imply put, a pattern of screaming at [McDermott], using gender-based and demeaning slurs to refer to [her], and treating other women in the workplace in the same offensive and demeaning manner creates a hostile work environment."

9

The court further disagreed that defendants' alleged conduct constituted "discrete, independent forms of harassment occurring between 2015 to 2019 . . . ." Instead, the court held the two-year statute of limitations clock for her LAD claim based on sexual and gender-based harassment/hostile work environment did not begin to run because McDermott "continued to be subject to the same harassing behavior throughout the duration of her tenure and up until the cessation of her employment in November 2022." The court therefore ruled McDermott's sexual harassment claim was "viable and timely."

The court also concluded the EFAA precluded from arbitration McDermott's timely sexual harassment claims despite the arbitration provision in her employment agreement. With regard to the remaining claims in the complaint, the court, however, determined a conflict existed between the EFAA and the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, and explained "the imperative is to harmonize the FAA and EFAA in order to give effect to both."

To do so, the court followed the Magistrate Judge's opinion in Mera v. SA Hospitality Group, 675 F. Supp. 3d 442, 447 (S.D.N.Y. 2023), and found "the EFAA does not intend to exclude from arbitration claims that are unrelated to a claim of sexual harassment and are otherwise arbitrable." The court concluded the EFAA's legislative history "confirms that the intent of the

EFAA is not to be the catalyst for destroying predispute arbitration agreements in all employment matters."

In applying Mera to "bifurcat[e] . . . arbitrable claims unrelated to sexual harassment," the court also relied on KPMG LLP v. Cocchi, 565 U.S. 18, 19, 22 (2011) to explain the factual allegations underlying McDermott's gender discrimination in count one and constructive discharge claims in count three were "inextricably intertwined" with the allegations of sexual harassment in count two and "not subject to arbitration."  As to the remaining claims in the complaint, however, and consistent with Mera, it determined "they are sufficiently unrelated to sexual harassment" and "therefore, the EFAA does not prohibit bifurcation of those claims for arbitration."

Finally, the court found the arbitration agreement's fee-shifting provision and forum selection clause "unenforceable as against public policy" because these provisions would unduly burden and unfairly deprive McDermott from exercising statutory rights she would otherwise be entitled.  In accordance with the agreement's severability provision, the court severed the objectionable provisions from the agreement but declined to find the agreement, as a whole, unconscionable.

The court denied McDermott's application to reconsider the portion of the court's order compelling arbitration on counts four through fourteen.  The

11

court held neither the facts nor the interests of justice required reconsideration. The court reiterated its conclusion that the "factual underpinnings" of McDermott's counts four through fourteen are not sufficiently "inextricably intertwined" with her sexual harassment claims to consider barring arbitration for those other claims.

Before us, McDermott makes five arguments in support of her contention that the trial court erred in applying the EFAA's arbitration bar only to her sexual harassment, gender discrimination, and constructive discharge claims. First, she contends the EFAA exempts all claims properly joined in a single case involving a sexual harassment cause of action. Relying on Johnson v. Everyrealm, 657 F. Supp. 3d 535 (S.D.N.Y. 2023), she argues the word "case" as used in section 402(a) is clear and unambiguous. She further contends "additional canons of statutory construction" and the EFAA's legislative history also support the notion that Congress "intended the EFAA to extend to entire cases, not simply the sexual harassment claims set forth in multi-claim actions." Finally, she maintains the "principles of judicial comity" support her interpretation of the EFAA because of "widespread and growing consensus among the federal courts that the EFAA applies to entire cases."

Second, McDermott claims the trial court erred in attempting to "harmonize" the EFAA and FAA because the EFAA "expressly displaced" the

A-0921-24

FAA and its claim-splitting rules. Third, she argues the "relates to" language of Section 402(a) should be interpreted broadly, especially in the arbitration context, because "it would be ironic if . . . a case or a claim is only 'related' to a sexual harassment dispute if . . . those claims are 'inextricably linked' with a sexual harassment cause of action." Fourth, she argues forcing her "non-sexual harassment claims" to arbitration would undermine the EFAA's core purpose and basic principles regarding improper claim-splitting.

McDermott also reprises her argument that the arbitration provision is unconscionable and hence unenforceable based on the forum selection clause and fee-shifting provisions, which she maintains "form an integral part of the agreement's arbitration scheme," thus making severance impracticable. She also asserts enforcing the arbitration provision would "inappropriately reward[] strategic overreach in contract drafting."

In their cross-appeal, defendants argue the trial court erred in concluding McDermott's sexual harassment claim in count two was timely under the LAD's two-year statute of limitations, N.J.S.A. 10:5-12(d). They assert the court's "application of the continuing violation rule . . . is erroneous because it misconstrues these allegations as indiscrete acts incapable of triggering the statutory limitations clock." Finally, they argue her "generic allegations" for

13

sexual harassment "fall far short of satisfying the pleading requirements imposed under Rule 4:6-2(e)."

Defendants also argue that the court erred "in finding [p]laintiff's gender discrimination claim was 'inextricably intertwined' with her sexual harassment claim" because her gender discrimination claim is premised on different factual allegations than the conduct animating her sexual harassment claim. Thus, defendants assert her gender discrimination claim should be subject to arbitration.

B.

In Rivera-Santana's complaint, she alleges since the start of her employment as a driver for defendant CJF Shipping, LLC (CJF), she was subjected to discrimination, hostile workplace sexual harassment, and wrongful termination on the basis of her gender. She also asserts that Marie Sanchez, her fleet manager and direct supervisor, and Julie Batista, CJF's Human Resources Coordinator, discriminated and retaliated against her based on her pregnancy. Rivera-Santana maintains the discrimination and retaliation she faced for her pregnancy culminated in her alleged wrongful termination.

Rivera-Santana began working at CJF as a driver, where she would deliver "an average of about three hundred . . . packages per day," requiring "strenuous physical activity" including "lifting and carrying large and heavy

14

boxes." She alleges that she was subjected to sexual harassment and a hostile work environment from her coworkers "[f]rom the outset" of her employment, specifically when the drivers would gather each morning to receive their delivery routes. She alleges she "was forced to endure the perverse commentary of her male counterparts," and that "these comments were made to and around [her] because of the fact she was female."

After learning of her pregnancy, Rivera-Santana informed Sanchez and Batista and requested an accommodation "in the form of modified work tasks, or a different role which did not require her to lift heavy items." She contends she also provided Sanchez and Batista with her doctor's written recommendation for that accommodation. CJF switched Rivera-Santana's role to a dispatcher, a position that did not require Rivera-Santana to perform physical labor, but also significantly reduced her hours. Rivera-Santana alleges that CJF had "a common practice" of reducing employee's hours "to force them to quit."

After switching positions, she contends Sanchez began criticizing her for "minor errors" and started pressuring her to resume her driving responsibilities. Rivera-Santana also claims Batista "told . . . her working as a dispatcher was becoming a problem." Rivera-Santana alleges she found a threatening note on her car while parked at the office and also claims her car

15

window and tires were slashed while parked at home. She contends a former coworker informed her Sanchez "was involved in a plan to damage [p]laintiff's car." Following these incidents, Rivera-Santana asserts she obtained and forwarded to Batista an additional written recommendation from her doctor explaining her physical limitations because of her pregnancy.

While working as a dispatcher, Rivera-Santana alleges Sanchez asked her to replace a driver after CJF failed to find a substitute. She further maintains she agreed to cover the driver's route on the condition that Sanchez acknowledge she was requesting her to defy her physician's orders. She asserts Sanchez refused and told her she was "being difficult." Later that same day, after speaking with Rivera-Santana briefly, Batista emailed her a termination letter, "due to a lack of available work" because CJF was "facing a significant demand reduction . . . [and] reduced need for staff." Rivera-Santana alleges CJF hired several additional drivers and dispatchers within the week after her termination. She also claims her termination was "a direct act of retaliation" for refusing to resume driving while pregnant.

When first hired by CJF, Rivera-Santana signed an arbitration agreement, which stated that "[t]he employee and company agree that any covered claim . . . whether based in contract, tort, statute, common law, fraud, misrepresentation or any other legal or equitable theory, shall be submitted to

16

individual binding arbitration." Pursuant to the agreement's terms, covered claims included, among other things, "claims asserted under or relating to . . . Title VII of the Civil Rights Act of 1964 and similar state statutes . . . ."

In her initial complaint, Rivera-Santana alleged defendants' actions constituted discrimination, hostile work environment, and wrongful termination on the basis of pregnancy, retaliation, and pregnancy discrimination, failure to accommodate, and failure to engage in the interactive process. Rivera-Santana later amended her complaint to add a fourth count alleging sexual harassment, gender discrimination, and hostile work environment. Defendants moved to dismiss the amended complaint under Rule 4:6-2(a) and (e), alleging that count four was time-barred, and sought to compel arbitration on the remaining counts.

After considering the parties' written submissions and oral arguments, the court[4] denied defendants' motion to dismiss Rivera-Santana's sexual harassment and gender discrimination claim in count four, but dismissed the remaining counts, directing those causes of action to arbitration. In its oral decision, the court declined to dismiss Rivera-Santana's sexual harassment claims under the LAD in count four based on the applicable statute of

---

[4] A different Law Division judge than the judge in McDermott issued this ruling.

A-0921-24

limitations, N.J.S.A. 10:5-12(d).  The court explained it did not "have enough information" as to whether the claim was timely "or the exact nature of the claim," but liberally construed the factual allegations in the complaint and denied defendants' motion.

The court also denied defendants' application to dismiss her sexual harassment claim, concluding the EFAA precluded arbitration for that cause of action.  The court, however, granted the motion to dismiss as it concerned counts one through three and directed those claims to arbitration because it found "[t]here is a valid, enforceable, unambiguous arbitration agreement that requires the remaining causes of actions to arise out of a set of different facts than the sexual harassment claims to be arbitrated."

Before us, Rivera-Santana, like McDermott, argues the EFAA applies to all of her claims because of "the broad and sweeping definition of the phrase 'relates to,' as set forth in applicable case law."  She also argues the EFAA adopts state definitions, and, in New Jersey, "the term 'sexual harassment' . . . has a broad definition under almost four decades of decisional law, encompassing any gender-based workplace harassment."  Next, relying on Johnson, Rivera-Santana argues "that as long as a claim of sexual harassment pends in a case, the EFAA blocks arbitration of the entire case."

Defendants also argue the trial court erred in denying their motion to dismiss Rivera-Santana's sexual harassment claim as untimely and that, without this error, the EFAA would not have been invoked. They further argue these claims "rel[y] on discrete, independent forms of sexual harassment that purportedly occurred at the outset of her employment in 2021, at which time the LAD's two-year statute-of-limitations clock began ticking."

We granted the National Employment Lawyers Association of New Jersey's (NELA-NJ) application to appear as amicus curiae in Rivera-Santana's appeal. It contends the plain language of the EFAA expressly prohibits compelling arbitration of a case that relates to a sexual harassment dispute. It urges the court to "follow the long line of cases" that adopt such a view, highlighting the "well-reasoned analysis of Johnson . . . and its progeny." Finally, it argues the EFAA adopts state law definitions of sexual harassment, which in New Jersey under the LAD, includes gender-based harassment, whether or not it is sexual in nature.

## II.

We first discuss the applicable and familiar standards of review that guide our analysis. "Rule 4:6-2(e) motions to dismiss for failure to state a claim upon which relief can be granted are reviewed de novo." Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021) (citing Dimitrakopoulos v.

Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019)). We apply a similar de novo review to Rule 4:6-2(a) applications. Santiago v. N.Y. & N.J. Port. Auth., 429 N.J. Super. 150, 156 (App. Div. 2012).

When considering a Rule 4:6-2(e) motion, "[a] reviewing court must examine 'the legal sufficiency of the facts alleged on the face of the complaint,' giving the plaintiff the benefit of 'every reasonable inference of fact.'" Baskin, 246 N.J. at 171 (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). "The essential test [for determining the adequacy of a pleading] is simply 'whether a cause of action is "suggested" by the facts.'" Green v. Morgan Props., 215 N.J. 431, 451-52 (2013) (quoting Printing Mart-Morristown, 116 N.J. at 746). "At this preliminary stage of the litigation the [c]ourt is not concerned with the ability of [the] plaintiffs to prove the allegation contained in the complaint." Printing Mart-Morristown, 116 N.J. at 746.

To survive a Rule 4:6-2(e) motion, the plaintiff must present "the essential facts supporting plaintiff's cause of action [, and] . . . conclusory allegations are insufficient in that regard." Scheidt v. DRS Techs., Inc., 424 N.J. Super. 188, 193 (App. Div. 2012) (citing Printing Mart-Morristown, 116 N.J. at 768). "It is not enough for [the] plaintiffs to assert . . . that any

essential facts that the court may find lacking can be dredged up in discovery." Printing Mart-Morristown, 116 N.J. at 768.

Further, disputes involving the interpretation of a statute are questions of law, which we review de novo. Kocanowski v. Twp. of Bridgewater, 237 N.J. 3, 9 (2019) (citing State v. Fuqua, 234 N.J. 583, 591 (2018)). A trial court's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995) (citations omitted).

Next, "the principle of comity instructs state courts to give due regard to a federal court's interpretation of a federal statute." Glukowsky v. Equity One, Inc., 180 N.J. 49, 64 (2004). While federal court decisions other than those from the United States Supreme Court are not "per se" binding upon this court, those decisions "should be accorded due respect, particularly when they are in agreement." Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 80 (1990); see also Young v. Prudential Ins. Co. of Am., Inc., 297 N.J. Super. 605, 622 (App. Div. 1997) (noting that "[t]he interpretation of federal law by federal courts may be persuasive in a given case" even if those decisions "are not binding upon a state appellate court").

A-0921-24

Finally, "[w]hen our courts have not had occasion to resolve an issue, as is the case here, it is appropriate that we seek guidance from the courts of other jurisdictions to the extent that they are persuasive and consistent with the existing law" of a particular issue. Dzwonar v. McDevitt, 348 N.J. Super. 164, 173 (App. Div. 2002). And, while unpublished decisions do not hold any precedential value upon this court, Rule 1:36-3, those opinions may be cited by the parties to us as "secondary authority," particularly when they address an issue of first impression. Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2026).

## III.

We first address, and reject, defendants' arguments that both courts erred in denying their applications to dismiss plaintiffs' claims for sexual harassment, gender discrimination, and hostile work environment as untimely under the LAD's two-year statute of limitation.[5] Neither McDermott's claim

---

[5] Rivera-Santana asserts we should not even consider defendants' arguments on the statute of limitations issue because they failed to seek leave to appeal that portion of the court's interlocutory order. She also contends defendants improperly seek affirmative relief that expands "the relief granted by the trial court rather than merely support the judgment on existing grounds."

In appropriate cases, we may grant leave to appeal nunc pro tunc. R. 2:4-4(b)(2); see also Yuhas v. Mudge, 129 N.J. Super. 207, 209 (App. Div. 1974) (granting leave to appeal nunc pro tunc "in the interest of prompt disposition of the matter"). Such relief, however, is not automatically granted and should

under count two nor Rivera-Santana's claim under count four were time barred because they alleged they suffered "repeated, pervasive, severe, and continuing instances of sexual harassment based on [their] gender/sex." Those allegations, viewed as we must through the indulgent lens of a Rule 4:6-2(e) application, see Printing Mart-Morristown, 116 N.J. at 746, clearly satisfied the continuing violation theory, which applies to an alleged "pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment." Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 21 (2002).

As noted, we review de novo a trial court's denial of a motion to dismiss. Further, we conduct that review "mindful of the test for determining the adequacy of a pleading: whether a cause of action is 'suggested' by the facts." Printing Mart-Morristown, 116 N.J. at 746 (quoting Velantzas v. Colgate-

_____

not be presumed as granting leave to appeal nunc pro tunc is the "most extraordinary relief . . . ." Hallowell v. Am. Honda Motor Co., 297 N.J. Super. 314, 318 (App. Div. 1997) (quoting Frantzen v. Howard, 132 N.J. Super. 226, 227-28 (App. Div. 1975)).

Although we agree with Rivera-Santana that the better practice would have been for defendants to have sought leave to appeal, as defendants did in the McDermott matter, we have concluded, under the circumstances, the most appropriate course is to grant leave to appeal and address the issues raised. We grant this extraordinary relief to avoid any further delay in the prosecution of this matter and to address the merits of the court's rulings. See Yuhas, 129 N.J. Super. at 209; see also Hallowell, 297 N.J. Super. at 318.

A-0921-24

Palmolive Co., 109 N.J.189, 192 (1988)). "[O]ur inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint" and "plaintiffs are entitled to every reasonable inference of fact . . . ." Ibid. Courts are "not concerned" at this stage "with the ability of plaintiffs to prove the allegation contained in the complaint." Ibid.

We also review issues regarding application of the statute of limitations de novo. Chipola v. Flannery, 261 N.J. 460, 467 (2025). "The statute of limitations for LAD claims is two years." Roa v. Roa, 200 N.J. 555, 566 (2010). "For causes of action arising under anti-discrimination laws, however, a judicially created doctrine known as the continuing violation theory has developed as an equitable exception to the statute of limitations." Ibid. (quoting Bolinger v. Bell Atl., 330 N.J. Super. 300, 306 (App. Div. 2000)). "The doctrine provides that when an individual experiences a 'continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases.'" Ibid. (quoting Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999)). "The premise underlying the doctrine is that the conduct becomes actionable because of its 'continuous, cumulative, synergistic nature.'" Ibid. (quoting Wilson, 158 N.J. at 273).

In analyzing statute of limitations questions, the United States Supreme Court has differentiated between "discrete" discriminatory acts and hostile

24

work environment claims in the Title VII context. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002). In that case, the Court explained that some discrete acts, "such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." Id. at 114. In such matters, "[e]ach [such] incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Ibid. Thus, a "discrete retaliatory or discriminatory act 'occur[s] on the day that it 'happen[s].'" Id. at 110. The Morgan Court stated that "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." Id. at 115. In a hostile work environment case, "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day" since "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Ibid.

Our Supreme Court adopted these principles in the LAD context. Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 21 (2002); see also Roa, 200 N.J. at 568. In doing so, the Court stated that if a plaintiff has alleged one or more discrete acts of discriminatory conduct by defendants, "then their cause of action would have accrued on the day on which those individual acts occurred." Shepherd, 174 N.J. at 21. But if a plaintiff has

25                                                          A-0921-24

"alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment," then "their cause of action would have accrued on the date on which the last act occurred, notwithstanding 'that some of the component acts of the hostile work environment [have fallen] outside the statutory time period.'" Shepherd, 174 N.J. at 21 (alteration in original) (quoting Morgan, 536 U.S. at 117); see also Roa, 200 N.J. at 568-69.

The Court also found that "a victim's knowledge of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based." Shepherd, 174 N.J. at 22. "Stated differently, knowledge of hostility and ongoing acts consistent with that hostility in such a setting is insufficient to trigger the limitation timeframe within which a LAD cause of action must be filed." Alexander v. Seton Hall Univ., 204 N.J. 219, 230 (2010).

We are convinced the courts properly determined that plaintiffs' sexual harassment claims were timely under the LAD based on the continuing violation doctrine. Beginning with McDermott, defendants' argument on appeal is that the allegations surrounding her sexual harassment involve discrete acts from 2015, when McDermott first met Lamkin and he made an explicit sexual comment to her, through 2019 when she complained of

Lamkin's alleged abuse to Human Resources. Her sexual harassment claim, however, is not solely based on this 2015 comment. Rather, her complaint makes clear that she is alleging a pattern of sexual harassment, including that comment, that continued through her last day of employment. She alleges that, even after this comment in 2015, Lamkin continued to "regularly" use "gender-based and demeaning slurs to refer to [her]" and that Lamkin's alleged harassment continued until her final day of employment in November 2022. Her certification further illuminates that Lamkin's alleged harassment continued until her final day at GRI.

These allegations throughout her tenure of Lamkin yelling, being aggressive, and using demeaning and sexual slurs toward McDermott and other female employees up until plaintiff left GRI in November 2022 constitute "a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment . . . ." Shepherd, 174 N.J. at 21. And as the trial court found, even if McDermott knew that Lamkin's 2015 comment alone may have constituted sexual harassment, or even if she knew in 2019 that she had a valid sexual harassment claim when she complained to Human Resources, such knowledge "is insufficient to start the limitations clock," since she alleges that

"defendant[s] continue[d] the series of non-discrete acts on which the claim as a whole is based," even after these time periods until she resigned. Id. at 22.

Therefore, because McDermott's sexual harassment claim is based upon an alleged pattern of conduct culminating in a hostile work environment, her "cause of action would have accrued on the date on which the last act occurred, notwithstanding 'that some of the component acts of the hostile work environment [have fallen] outside the statutory time period.'" Id. at 21 (alteration in original) (quoting Morgan, 536 U.S. at 117). Plaintiff left her employment in November 2022 and filed her initial complaint in February 2024, within two years from "the date on which the last act occurred . . . ." Ibid. McDermott's complaint was thus timely filed.

We also conclude Rivera-Santana's hostile work environment sexual harassment claim was filed within the two-year LAD statutory period and reject defendants' argument that her sexual harassment claim is based upon discrete acts that occurred in 2021 when she was first hired by CJF because the specific sexual comments alleged in the complaint occurred at that time. Her complaint, however, also alleges that she was subject to sexual harassment during each day she was a driver for CJF, which lasted until May 12, 2023, when she learned of her pregnancy.

Although her complaint states that the alleged sexual harassment began "[f]rom the outset" of her employment with CJF, it does not say, as defendants assert, that it ended at that time as well or that it only occurred at the outset of her employment. Rather, plaintiff alleged that "she was subjected to sexual harassment by her coworkers" in the form of sexual commentary and commentary based on her being female "each morning" that she was a driver when meeting to discuss their routes. She alleged that "[e]ach morning, while gathered with her counterparts, [p]laintiff was forced to endure the perverse commentary of her male counterparts." Giving these allegations every reasonable inference, it is fair to conclude that Rivera-Santana is contending that the alleged sexual harassment occurred each morning that she was a driver. And the complaint states she was a driver until May 12, 2023, when she disclosed her pregnancy and requested an accommodation. Thus, because the alleged sexual harassment "occur[ed] over a series of days or perhaps years," each comment of which may not have been actionable on its own, the continuing violation doctrine applies. Morgan, 536 U.S. at 115; Shepherd, 174 N.J. at 21.

Further, despite defendants' argument that Rivera-Santana "should have known" these specific sexual comments by her coworkers were actionable, it does not matter if Rivera-Santana knew at the outset of her employment in

29

2021 that these comments could constitute a claim for sexual harassment if they continued throughout her time as a driver. Shepherd, 174 N.J. at 21-22. Rivera-Santana filed her initial complaint on August 23, 2024, well within two years of May 2023 when she stopped being a driver. Thus, we find Rivera-Santana's sexual harassment claim was also timely filed, and the trial court properly denied defendants' motion to dismiss.

IV.

Next, we address plaintiffs' contention that the EFAA prohibits arbitration for entire cases related to sexual harassment. We agree and conclude both courts erred in interpreting the EFAA in a circumspect manner as it is contrary to the plain language of Section 402(a) and the growing body of federal and state case law interpreting the EFAA.

The EFAA represents the "first major amendment in the history of the FAA," a law passed nearly a century ago to encourage courts to enforce arbitration agreements and their terms. Olivieri v. Stifel, Nicolaus & Co., Inc., 112 F.4th 74, 84 (2d Cir. 2024) (citing David Horton, The Limits of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 132 Yale L.J. Forum 1, 1 (2022)). The EFAA, whose passage is widely attributed to the #MeToo movement, reflects Congress's concern that "compelled arbitration of sexual harassment claims can perpetuate unacceptable behavior

and minimize its consequences by diverting such claims from public court proceedings into a private forum." Liu v. Miniso Depot CA, Inc., 326 Cal. Rptr. 3d 286, 288 (Cal. Ct. App. 2024).

As declared by Congress, the EFAA amended the FAA to provide:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.
>
> [9 U.S.C. § 402(a).]

The EFAA defines "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4). The EFAA was enacted on March 3, 2022, and thus only applies to claims that accrued on or after that date. Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022); Johnson, 657 F. Supp. 3d at 550.

Under the FAA, "if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." KPMG LLP, 565 U.S. at 19. However, the FAA's "liberal policy favoring arbitration agreements" may be "overridden by a

contrary congressional command." CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012) (quoting Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 226 (1987)).

At the outset, we find the EFAA applies here because plaintiffs' complaints each include a viable claim for hostile work environment sexual harassment in violation of the LAD. Both McDermott and Rivera-Santana filed their cases "under Federal, Tribal, or State law" and the allegations in their complaints "relates to the . . . sexual harassment dispute," 9 U.S.C. § 402(a), because their hostile work environment sexual harassment claims constitute "conduct that is alleged to constitute sexual harassment under applicable . . . State law," id. § 401(4).

Assuming the allegations in their complaints as true as we must, McDermott's sexual harassment claim arises from alleged conduct that lasted until November 2022 when she resigned from GRI. She filed her initial complaint on February 21, 2024, after the EFAA's March 3, 2022 effective date. As noted, Rivera-Santana filed her initial complaint on August 23, 2024, and her amended complaint on September 16, 2024 and alleged, in that amended pleading, claims that related to "the sexual harassment dispute," 9 U.S.C. § 402(a), and "conduct that is alleged to constitute sexual harassment

under applicable . . . State law," id. § 401(4).  The EFAA is thus properly applicable to both plaintiffs' cases.

We are further convinced both courts should have concluded that all of the claims in plaintiffs' operative complaints became non-arbitrable after deciding the EFAA applied.  We reach this conclusion based on the plain and unambiguous language of the EFAA, which invalidates pre-dispute arbitration agreements with respect to an entire "case" relating to sexual harassment or assault, rather than only to discrete claims. Congress deliberately used the broader term "case," and courts interpreting the EFAA have widely agreed that its protection applies to all claims within such an action.

The first step in statutory interpretation is to review the statute's plain language.  W.S. v. Hildreth, 252 N.J. 506, 518 (2023).  The plain language of the EFAA provides that "no predispute arbitration agreement . . . shall be valid and enforceable with respect to a case which is filed under . . . State law and relates to . . . the sexual harassment dispute."  9 U.S.C. § 402(a) (emphasis added).  We find the plain language of the statute is clear that once a case is filed under applicable law and relates to a sexual assault or sexual harassment dispute as defined, as here, an arbitration agreement becomes unenforceable "with respect to" that entire "case."  Ibid.; see Johnson, 657 F. Supp. 3d at 558 ("This text is clear, unambiguous, and decisive as to the issue here.  It keys the

33

scope of the invalidation of the arbitration clause to the entire 'case' relating to the sexual harassment dispute."). If Congress wanted to adopt defendants' and the courts' interpretation, it could have used the term "claim" rather than "case" or emphasized that arbitration would only be invalidated as to claims relating to the sexual harassment dispute, but it did neither of these things. Nowhere in § 402(a) is the term "claim" even used.

Instead, Congress used the term "case" in § 402(a), which refers to "a civil or criminal proceeding, action, suit, or controversy at law or in equity." Black's Law Dictionary 266 (12th ed. 2024). This contrasts with "claim," which refers to "[t]he assertion of an existing right" or "[a]n interest or remedy recognized at law." Id. at 311-12; see also Brownback v. King, 592 U.S. 209, 220-21 (2021) (Sotomayor, J., concurring) ("An 'action' refers to the whole of the lawsuit" while "[i]ndividual demands for relief within a lawsuit, by contrast, are 'claims.'"). Giving "case" its ordinary meaning, W.S., 252 N.J. at 518, the EFAA's text is clear that its invalidation of an arbitration agreement extends to the entire case relating to the sexual harassment dispute, not solely to the individual claims within the case that may be related to sexual harassment.

Further support for this interpretation is that Congress used the term "claim" in a surrounding EFAA provision. For example, when establishing the

34

A-0921-24

EFAA's effective date, the EFAA provides that "the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after Mar[ch] 3, 2022." Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022). That Congress specifically used the narrower term "claim" in describing when the EFAA will apply while using the broader term "case" within § 402(a), supports the principle that Congress understands the differences between the two terms and yet specifically chose to use the broader term in § 402(a) to encompass entire cases. Digital Realty Tr., Inc. v. Somers, 583 U.S. 149, 161 (2018) ("[W]hen Congress includes particular language in one section of a statute but omits it in another . . . this Court presumes that Congress intended a difference in meaning." (quoting Loughrin v. United States, 573 U.S. 351, 358 (2014))); Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 544 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."); Clean Air Council v. U.S. Steel Corp., 4 F.4th 204, 209 (3d Cir. 2021) (same).

All defendants argue such an interpretation renders the phrase "relates to" in § 402(a) "superfluous," and such an interpretation "is at odds with the conjunctive language utilized in [s]ection 402(a)." We disagree.

35

The interpretation we adopt gives meaning to all the words in the statute, using their plain meaning. Indeed, section 402(a) provides that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is," one, "filed under Federal, Tribal, or State law," and, two, "relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a). Both conditions refer to "a case" as a whole and the interpretation here does not render the "relates to" language superfluous, but rather directly uses that language to interpret that the case itself must relate to a sexual assault or sexual harassment dispute before § 402(a) is applicable. Defendants' and the trial court's interpretation, on the other hand, would read in to § 402(a) the word "claim," which does not appear anywhere within the statutory language, contrary to our canons of statutory interpretation. See Doe v. Est. of C.V.O., 477 N.J. Super. 42, 59 (App. Div. 2023) ("A court cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment or engage in conjecture or surmise which will circumvent the plain meaning of the act.'" (quoting Soto v. Scaringelli, 189 N.J. 558, 569-70 (2007))).

We are also persuaded by the fact that, although New Jersey courts have yet to address this issue, the majority of courts that have considered the scope of the EFAA have reached the same plain language interpretation, even when

the plaintiff alleges claims beyond those that inherently relate to sexual assault or sexual harassment. For example, in <u>Johnson</u>, the plaintiff entered into an arbitration agreement when he was hired. 657 F. Supp. 3d at 539. Over the course of his employment, plaintiff alleged that he was subject to various sexual and racist comments that culminated in a hostile work environment. <u>Id.</u> at 542-46. He brought claims against his employer and other employees, including the company's CEO, for sexual harassment and hostile work environment as well as for race discrimination, pay discrimination, aiding and abetting the discrimination, whistleblower retaliation, and common law claims for intentional infliction of emotional distress. <u>Id.</u> at 539-40, 547. His employer moved to compel arbitration based on the mandatory arbitration agreement in plaintiff's employment agreement. <u>Id.</u> at 547.

The <u>Johnson</u> court first found that plaintiff's claim for sexual harassment under New York law "ha[d] been plausibly pled" and therefore "implicate[d] the EFAA." <u>Id.</u> at 551. After finding that the EFAA applied, the court engaged in an analysis as to whether the arbitration agreement was unenforceable as to only the sexual harassment claims or to the entire case. <u>Id.</u> at 558. The court determined that the plain language of the EFAA and Congress's use of the word "case" within § 402(a) was "clear that its invalidation of an arbitration agreement extends to the entirety of the case

37

relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute . . . ." Id. at 559. It also found that "[i]f further confirmation of that understanding were needed, a surrounding EFAA provision—the one that sets the EFAA's effective date—uses the narrower term 'claim'" which supports that Congress was "sensitive to the distinct meanings of the terms 'case' and 'claim.'" Id. at 559-60.

Beyond the plain language of the EFAA, the Johnson court also found it significant that the EFAA amended the FAA directly "rather than, for example, amending a separate statute, such as Title VII, to bar the arbitration of certain claims arising under it. . . ." Id. at 560. It found that Congress's direct amendment of the FAA when enacting the EFAA "with text broadly blocking enforcement of an arbitration clause with respect to an entire 'case' 'relating to' a sexual harassment dispute reflects its rejection—in this context—of the FAA norm of allowing individual claims in a lawsuit to be parceled out to arbitrators or courts depending on each claim's arbitrability." Id. at 561 (quoting 9 U.S.C. §402(a)). Based on those findings, the Johnson court held that "where a claim in a case alleges 'conduct constituting a sexual harassment dispute,' as defined, the EFAA, at the election of the party making such

A-0921-24

allegation, makes pre-dispute arbitration agreements unenforceable with respect to the entire case relating to that dispute." Ibid.

The McDermott court rejected, in part, Johnson's analysis based on a footnote in the opinion that noted:

> The [c]ourt does not have occasion here to consider the circumstances under which claim(s) far afield might be found to have been improperly joined with a claim within the EFAA so as to enable them to elude a binding arbitration agreement. Johnson's claims against Everyrealm and its executives all arise from his employment at Everyrealm and are clearly properly joined in a common lawsuit.
>
> [657 F. Supp. 3d at 562 n.23.]

Relying on this footnote and KPMG LLP, 565 U.S. at 19, 22, the court concluded, as noted, McDermott's counts four through fourteen did not satisfy the "related to" language of the EFAA, 9 U.S.C. § 402(a), because it was not "inextricably intertwined with the allegations of sexual harassment" in her count two, unlike her gender discrimination and constructive discharge causes of action.

We conclude the court's reliance on that footnote was misplaced, as none of defendants argue McDermott's claims in counts four through fourteen of her complaint, nor Rivera-Santana's claims in counts one through three, were "improperly joined with a claim within the EFAA so as to enable them to elude a binding arbitration agreement." Johnson, 657 F. Supp. 3d at 562 n.23. As in

39

A-0921-24

<u>Johnson</u>, plaintiffs' claims "all arise from [their] employment at [GRI and CJF] and are clearly properly joined in a common lawsuit."[6] <u>Ibid.</u>

We also find no support for the McDermott court's "inextricably intertwined" language in either the statutory text of the EFAA, or interpretive case law. We further conclude nothing in <u>Johnson</u> supports either courts' decision to bifurcate plaintiffs' claims.

We are satisfied, to the extent that a nexus between the sexual harassment dispute and other non-sexual harassment claims is necessary to satisfy the meaning of "relate to" in the EFAA, 9 U.S.C. § 402(a), both plaintiffs have met this threshold as their additional ostensibly non-sexual harassment claims are materially and substantially informed by the nature of the sexual-harassing employment relationship. <u>See</u> <u>Johnson</u>, 657 F. Supp. 3d at 562 n.23; <u>see also</u> <u>Diaz-Roa v. Hermes Law, P.C.</u>, 757 F. Supp. 3d 498, 518, 533 (S.D.N.Y. 2024) ("[T]he concern that application of the EFAA will sweep in claims that are entirely unrelated to the sexual harassment or the sexual assault appears to be overstated. Virtually by definition, all of the claims to which the EFAA applies will arise from the relationship that the plaintiff has with his or her harasser or assaulter."); <u>Turner v. Tesla, Inc.</u>, 686 F. Supp. 3d

---

[6] We note defendants have not explicitly argued before us that Rivera-Santana amended her complaint to include her LAD sexual harassment claim expressly to avoid arbitration of her other claims.

917, 926 (N.D. Cal. 2023) (applying the EFAA to bar arbitration of plaintiff's workplace injury and wage claims because they "arose out of the same facts and circumstances underlying [the] sexual harassment causes of action and is substantially related to her sexual harassment claim.").

We also note federal courts have broadly interpreted the phrases "relate to" and "relating to" in other federal statutes. For example, the Supreme Court noted that "[t]he ordinary meaning of ['relating to'] is a broad one" and defined the phrase as meaning "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383-84 (1992) (citing Black's Law Dictionary 1158 (5th ed. 1979)) (interpreting the phrase "relating to [air carriers'] rates, routes, or services" in the pre-emption provision of the Airline Deregulation Act, 49 U.S.C. § 1305(a)(1)); see also Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 717 (2018) (citing Morales, 504 U.S. at 378-90) (noting "this Court has typically read ['relating to'] expansively" to conclude a single asset can be a "statement [relating to] the debtor's financial conditions," 11 U.S.C. § 523(a)(2)). Other federal courts have adopted similar broad interpretations across different contexts. See Denis v. Att'y Gen. of U.S., 633 F.3d 201, 212 (3d Cir. 2011) (explaining that "we . . . apply the phrase 'relating to' broadly" to hold a conviction for tampering with physical

evidence is "an offense relating to obstruction of justice," 8 U.S.C. § 1101(a)(43)(S)); Yong Wong Park v. Atty. Gen. of U.S., 472 F.3d 66, 72 (3d Cir. 2006) (noting the "broad reach of the term 'relating to'" to conclude a conviction for trafficking in counterfeit goods or service is "an offense relating to . . . counterfeiting," 8 U.S.C. § 1101(a)(43)(R)).

In McDermott's complaint, she alleges her claims stem from her relationship with GRI and the harassing employment environment defendants created with respect to her and other female employees, whether through sexual harassment or pay disparity or misappropriating her likeness and not giving her proper wages after she left. The same is true of Rivera-Santana's complaint, in which she explains her reluctance to return to the role of a driver due both to the ongoing sexual harassment and her doctor recommendations concerning her physical limitations while pregnant. We are satisfied all of plaintiffs' causes of action relate to their employment relationship, which, according to both, was animated by sexual harassment.

Moreover, although defendants in both appeals argue in effect "the only way to harmonize the underlying purpose of the FAA with the EFAA" is to bifurcate the claims as both courts did, as the Johnson court explained, Congress directly amended the FAA to state that "[n]otwithstanding any other provisions" of the FAA, the provisions of § 402(a) of the EFAA would apply.

A-0921-24

9 U.S.C. § 402(a). Thus, the courts need not have attempted to harmonize those statutes or give weight to the FAA's promotion of arbitration, but instead should have principally relied on the plain language of the EFAA, which overrides the FAA on this issue to provide that an arbitration agreement will become unenforceable as to an entire case that is filed under applicable law and relates to a sexual harassment dispute. Johnson, 657 F. Supp. 3d at 560-61; see also Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993) ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.").

Defendants in both appeals principally rely on the Magistrate Judge's opinion in Mera, 675 F. Supp. 3d at 447, a case decided three months after Johnson, 657 F. Supp. 3d at 586. Mera reflects the only published decision cited by defendants that is in direct conflict with Johnson. For the reasons discussed, we disagree with the Magistrate Judge's analysis and result.

In Mera, plaintiff signed an arbitration agreement in which he agreed to arbitrate "any disputes arising out or in any way relating to [his] employment or termination from employment . . . ." Ibid. Plaintiff alleged during the course of his employment he was subject to a hostile work environment based

43

on the defendants' sexual orientation discrimination.  Id. at 444.  He asserted claims for hostile work environment sexual harassment in violation of the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL) and also asserted claims for alleged unpaid wages in violation of the Fair Labor Standards Act (FLSA) and New York Labor Law (NYLL).  Ibid.

The Mera court first found that the plaintiff's complaint contained allegations that were "sufficient to raise 'a dispute relating to conduct that is alleged to constitute sexual harassment under [the NYSHRL]'" and that therefore "[p]laintiff's [c]omplaint pleads a dispute within the scope of the EFAA."  Id. at 446-47 (quoting 9 U.S.C. § 401(4)).  In determining whether, pursuant to the EFAA, the arbitration agreement would be unenforceable as to the whole case or only to the claims relating to sexual harassment, the court found that "under the EFAA, an arbitration agreement executed by an individual alleging conduct constituting a sexual harassment dispute is unenforceable . . . only with respect to the claims in the case that relate to the sexual harassment dispute."  Id. at 447.

The Mera court determined that Johnson "is inapposite" because:

> Here, unlike the plaintiff in Johnson, who alleged that he was singled out for disparate treatment in the form of sexual harassment, race discrimination (including pay discrimination) and retaliation . . . [p]laintiff in

44

the present case alleges, with respect to his FLSA and NYLL claims, that "all non-exempt employees, including servers, bartenders, barbacks, waiters, bussers, and food runners among others, employed by [d]efendants" were "subjected to [d]efendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them their proper wages." The only claims that are distinct to [p]laintiff in this case are his [claims relating to sexual harassment], which are based on the allegations that [d]efendants failed "to address the constant harassment and abuse made against [p]laintiff on the basis of his sexual orientation."

[Id. at 448 (internal citations omitted).]

In deciding to bifurcate plaintiff's arbitrable claims, the court found that "[t]o hold otherwise would permit a plaintiff to elude a binding arbitration agreement with respect to wholly unrelated claims <u>affecting a broad group of individuals</u> having nothing to do with the particular sexual harassment affecting the plaintiff alone." Id. at 447 (emphasis added).

Mera, however, was recently reversed, in part, and affirmed on other grounds by the District Court. Mera v. SA. Hosp. Grp., LLC, 2025 U.S. Dist. LEXIS 225349, at *26 (S.D.N.Y. Nov. 17, 2025). The District Court concluded, relying on the plain text of the EFAA, that the Magistrate Judge's decision to bifurcate plaintiff's claims was "clearly erroneous and contrary to law." Id. at 26. The District Court finally found, pursuant to Johnson, that, "where–as here–the EFAA is properly invoked and applies, a pre-dispute

45

arbitration agreement is invalid and unenforceable as to the plaintiff's entire case, and not just to plaintiff's sexual harassment claims." Ibid.[7]

Even before its reversal, published cases in New York and Connecticut followed Johnson's holding rather than Mera's. See Clay v. FGO Logistics, Inc., 751 F. Supp. 3d 3, 11, 20 (D. Conn. 2024) ("Because [plaintiff's] retaliation claim is a sexual harassment dispute, and because the case as a

_____

[7] Separate from the substantive views expressed by the District Court, we are convinced Mera is factually distinguishable from plaintiffs' claims. The Magistrate Judge in Mera found that the plaintiff's wage and hour claims were not related to the sexual harassment dispute because the plaintiff brought them on behalf of all employees and they were not "distinct to [p]laintiff" and did not "affect[] the plaintiff alone." 675 F. Supp. 3d at 447-48. This is a factual caveat relevant to that case but one that does not appear in many others, including both before us.

Here, all of plaintiffs' claims are distinct to themselves. Although McDermott states that GRI was sexually harassing and discriminating other women employees to explain her the hostile work environment claim, she ultimately brings the allegations in her complaint on behalf of herself, not a large class of employees. Further, Rivera-Santana's claims, including those relating to pregnancy discrimination, retaliation, and failure to accommodate, "affect[] . . . plaintiff alone." Id. at 447.

Other courts distinguished and rejected the Magistrate Judge's opinion in Mera on this basis. See, e.g., Turner, 686 F. Supp. 3d at 926 (distinguishing Mera because the plaintiff's "workplace injury and wage claims relate only to her own experience and employment at Tesla"); Doe v. Second Street Corp., 326 Cal. Rptr. 3d 42, 59-60 (Cal. Ct. App. 2024) (finding that Mera "is inapposite" because the Magistrate Judge in Mera "reasoned that the case before it was distinguishable from Johnson because there the plaintiff alleged claims only on his own behalf, while Mera alleged both harassment claims that were unique to him and wage-and-hour claims on behalf of all non-exempt employees.").

whole relates to that dispute, . . . the EFAA bars enforcement of the arbitration agreement as to [plaintiff's] entire case," even when plaintiff alleged claims for racial discrimination and intentional infliction of emotional distress beyond those for sexual harassment and retaliation); Diaz-Roa, 757 F. Supp. 3d at 518, 532 (concluding that "if the EFAA is properly invoked and applies, the pre-arbitration agreement is invalid and unenforceable with respect to the entire case" when plaintiff also brought contractual claims and a claim for conversion that survived a motion to dismiss beyond a claim for sexual harassment); Newton v. LVMH Moet Hennessy Lous Vuitton Inc., 746 F. Supp. 3d 135, 150 (S.D.N.Y. 2024) ("[T]he EFAA's provision that a litigant may elect to invalidate an arbitration agreement for any 'case' requires courts to render such agreements unenforceable for an entire case" and "[t]his is so even if only some or one of the claims a party asserts specifically relate to sexual harassment and/or sexual assault."), reconsideration denied in part, granted in part on other grounds, No. 23-cv-10753, 2025 U.S. Dist. LEXIS 126427 (S.D.N.Y. Jul. 2, 2025); Delo v. Paul Taylor Dance Found., Inc., 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023) (agreeing with Johnson that "where a dispute presents multiple claims—some related to sexual harassment, others not—the EFAA blocks arbitration of the entire case, not just the sexual harassment claims").

47

Similarly, cases in California have also interpreted the EFAA consistent with Johnson. For example, in Casey v. Superior Court of Contra Costa County, 329 Cal. Rptr. 3d 518 (Cal. Ct. App. 2025), the plaintiff signed an arbitration agreement when she began work for the defendant homebuilding company. Id. at 522. After being subjected to unwanted sexual remarks, the plaintiff sued the company and one of its employees, alleging sexual harassment, gender discrimination, retaliation, and failure to prevent discrimination and harassment as well as negligent hiring, constructive discharge, and various wage claims. Id. at 522-23. The defendants filed a motion to compel arbitration, which the court granted. Id. at 523.

After finding that the EFAA applied since the plaintiff plausibly alleged a claim for sexual harassment, the court found that "[t]he EFAA provides that it applies to 'a case' . . . —as opposed to a claim—that a plaintiff brings alleging sexual harassment, meaning that the EFAA applies to an entire case." Id. at 528. Although the defendants in that case, like the defendants here, "contend[ed] that even if the plaintiff was permitted to opt out of the arbitration agreement as to her claims for sexual harassment, the order compelling arbitration must be affirmed as to [plaintiff's] wage-and-hour claims" the court "disagree[d]." Ibid. It determined that, "[c]onsistent with other state appellate courts that have considered the issue, we hold that where

48

a plaintiff's lawsuit contains at least one claim that fits within the scope of the EFAA, 'the arbitration agreement is unenforceable as to all claims asserted in the lawsuit.'" Ibid. (quoting Liu, 326 Cal. Rptr. 3d at 291).

Other published California cases, both in federal and state appellate courts, reached this same conclusion. See Ding Ding v. Structure Therapeutics, Inc., 755 F. Supp. 3d 1200, 1218-19 (N.D. Cal. 2024) ("Congress would have understood that section 402(a)'s command would override the [FAA's] statutory scheme. So, when a complaint includes at least one EFAA covered claim . . . the [arbitration] agreement is invalid as to the whole 'case' . . . ."); Turner, 686 F. Supp. 3d at 925 (finding the EFAA precluded arbitration "as to each cause of action" in plaintiff's complaint even when some claims were not directly related to sexual harassment); Second Street Corp., 326 Cal. Rptr. 3d at 59-60 (reaching the same conclusion and noting that "Johnson has been widely followed"); Liu, 326 Cal. Rptr. 3d at 293-94 (same).

Against this backdrop of nearly uniform persuasive authority, we reject defendants' approach and agree with the Johnson court and the majority of other courts that have addressed the issue and conclude that the plain language of the EFAA is clear such that if a complaint is filed under applicable law, and the case relates to a sexual harassment dispute as defined in the statute, any

49

pre-dispute arbitration agreement becomes unenforceable as to that whole case. "If the plain language leads to a clear and unambiguous result, then our interpretive process is over." In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 18 (2020) (quoting Richardson v. Bd. of Trs., PFRS, 192 N.J. 189, 195 (2007)). On this basis alone, we reverse the courts' decisions.[8]

The McDermott court also relied on the statements of two senators, Senator Kirsten Gillibrand and Senator Joni Ernst, to conclude that "it is clear that the EFAA does not intend to exclude from arbitration claims that are unrelated to a claim of sexual harassment." Defendants in Rivera-Santana have relied on these same statements to support their argument.

However, as noted, because the statutory text has a clear meaning, we need not delve into the EFAA's legislative history to discern its intent. In re Ridgefield Park Bd. of Educ., 244 N.J. at 18. We nevertheless discuss the legislative history for the sake of completeness and observe that nothing in the

---

[8] As discussed, we note the overwhelming majority of unpublished and published cases adopt the approach outlined in Johnson. For this and the other reasons expressed in our opinion, we also reject the unpublished opinions relied upon by defendants because they either rely on the now-reversed-in-part Mera decision, rather than the majority approach expressed in Johnson, or are factually distinguishable. With respect to defendants' reliance on unpublished California trial court decisions, we find those cases unpersuasive in light of the published opinions from the California Court of Appeals that agreed with Johnson. See, e.g., Casey, 329 Cal. Rptr. 3d at 528; Second St. Corp., 326 Cal. Rptr. 3d at 59-60; Liu, 326 Cal. Rptr. 3d at 293-94.

A-0921-24

legislative history referenced by the court and defendants warrants a different conclusion than the plain language interpretation of the EFAA.

Indeed, the House Judiciary Committee's report on the EFAA states the EFAA's purpose is to "prohibit the enforcement of mandatory, pre-dispute arbitration ('forced arbitration') provisions in cases involving sexual assault or sexual harassment." H.R. Rep. No. 117-234, at 3 (2022). The EFAA, in turn, "would restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system or arbitration that often favors the company over the individual." Id. at 4. The purpose of the EFAA is a broad one meant to prohibit forced arbitration in "cases involving sexual assault or sexual harassment," also not limiting the EFAA to only claims involving sexual harassment. Id. at 3; see also Johnson, 657 F. Supp. 3d at 561 n.22.

We further note Senator Gillibrand, as one of the EFAA's sponsors, specifically stated that "[w]hen a sexual assault or sexual harassment survivor files a court case in order to seek accountability, her single case may include multiple claims" and "if those claims on harassment or assault are dismissed, then she would go back to the arbitration process." 168 Cong. Rec. S627 (daily ed. Feb. 10, 2022) (statement of Sen. Kirsten Gillibrand). She further

A-0921-24

stated if a sexual assault or sexual harassment claim was not involved in a case, "then this bill does not apply to it." Ibid. These comments, despite the McDermott court concluding otherwise, seemingly support the majority view that the EFAA, if applicable, would preclude all claims in a case, even if there are multiple claims involved, and suggest that the EFAA's drafters, as sophisticated legislators, likely were aware and understood that sexual harassment disputes are rarely prosecuted as one count complaints. We also note Senator Ernst's statement, the other statement relied on by the McDermott court, that the EFAA is "not to be the catalyst for destroying predispute arbitration agreements in all employment matters." 168 Cong. Rec. S625 (daily ed. Feb. 10, 2022) (statement of Sen. Joni Ernst).

To the extent that Senator Ernst's and Gillibrand's comments may be construed differently than our interpretation, it is "is a good example of why" these statements are one of "the least illuminating forms of legislative history," N.L.R.B. v. SW General, Inc., 580 U.S. 288, 307 (2017), and we should not allow "ambiguous legislative history to muddy clear statutory language," Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011).

Finally, we note, at least one court has also rejected the Magistrate Judge's approach in Mera as one that would be difficult to apply in practice, a position we adopt. Diaz-Roa, 757 F. Supp. 3d at 532 n.9. In Diaz-Roa, the

A-0921-24

court noted it would be hard for any court, given only the pleadings on a motion to compel arbitration, to decide whether individual claims relate to the sexual harassment dispute or not. The trial court's interpretation here "would require courts to carve up every case to which the EFAA applies by reaching judgment—with respect to each claim—on whether the claim relates to the sexual harassment or sexual assault dispute" which "not only is antithetical to the language of the EFAA and its protective intent . . . but it would also have the court address early in a case and in a definitive manner 'a question that often is not easily answered on the pleadings.'" Ibid. (quoting Alvarado v. Sweetgreen, Inc., 712 F. Supp. 3d 33, 406 (S.D.N.Y. 2024)). For instance, the court explained "[i]t is not self-evident for example, that evidence that the plaintiff was the victim of persistent sexual assault or harassment would be irrelevant to the claim that such person had also been deprived of her rights to minimum wage and overtime pay." Ibid.

Plaintiffs make similar arguments here. Indeed, plaintiffs' claims that their employment was animated by a pattern of sexual harassment and hostile work conditions by defendants are intertwined with their other claims. McDermott's claims stem from her employment with GRI, a relationship defined by sexual harassment whether it manifested as a hostile work environment or through tortious interference with plaintiff's ability to

53

underwrite mortgages. Further, Rivera-Santana's complaint explains she resisted returning to the driver role not only because of her doctor's recommendations but also because of the ongoing sexual harassment she faced from her coworkers.

For the trial courts to have sweepingly declared that every claim in the complaint that did not directly allege a LAD violation was not related to the sexual harassment dispute exemplifies the problem associated with bifurcation at the motion to dismiss stage. Although defendants argue <u>Johnson</u>'s approach could allow a plaintiff to "unfairly benefit[]," it is equally apparent that, adopting the Magistrate Judge's approach in <u>Mera</u> and the trial courts' approach, a court could compel to arbitration claims ostensibly unrelated to the sexual harassment dispute, only to later discover that such an allegation is connected to the sexual harassment claim, depriving a plaintiff of his or her right to bring that claim in court.

The approach of the <u>Johnson</u> court represents, not only faithful adherence to the text of EFAA, but it also reflects the more practical approach as it only requires inquiry, after establishing that a case has been brought under applicable law, as to whether a plaintiff has plausibly alleged conduct that would constitute a sexual assault or sexual harassment dispute as defined in the EFAA. And, although defendants also argue this approach would lead to

"strategic pleading" of "fabricated sexual harassment allegations,"—claims, we note, that have no support in the record—it is more likely that any potential strategy by a plaintiff to improperly allege a sexual harassment claim to invoke the EFAA to avoid arbitration would be ferreted out by a court on a motion to dismiss or to compel arbitration. Further, careful case management by a court can serve as an additional ongoing safeguard to identify and address trivial or unfounded claims.

In light of our decision, we need not discuss in further detail the issues raised on defendants' cross appeal regarding the court's decision to bar arbitration related to McDermott's count one and three for gender discrimination and constructive discharge. Similarly, we need not consider McDermott's arguments with respect to the unconscionability of her employment agreement, and the court's decision to sever the objectionable fee-shifting provision and forum selection clause.

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division